**SERV–AIR, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 9193.**

United States Court of Appeals
Tenth Circuit.

Jan. 19, 1968.

Rehearing Denied April 9, 1968.

Frank Carter, Enid, Okl. (Otjen, Carter & Huddleston, Enid, Okl., of counsel, were with him on the brief), for petitioner.

John E. Nevins, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Glen M. Bendixsen, Atty., N.L.R.B., were with him on the brief), for respondent.

Before WILBUR K. MILLER*, BREITENSTEIN and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Serv-Air, Inc., (the Company) petitions for review of an order of the National Labor Relations Board[1] and the Board requests enforcement of its order. The Company is engaged in the operation and maintenance of all facilities and equipment used in the pilot training program at Vance Air Force Base and auxiliary fields near Enid, Oklahoma. It has about 1,100 employees. The International Association of Machinists (the Union) attempted to organize the employees. As the result of an election held on May 6, 1964, Smoke-Eaters Lodge No. 898, an affiliate of the Union, was designated as the representative of about 85 employees in Fire and Rescue Department of the Company. We are concerned with unfair labor practice charges which arose after that date and continued for a number of months. The charges, and the facts pertaining thereto, are so interrelated that an orderly presentation is difficult.

1. *The No-solicitation Rule.*

In November 1960, the Company posted a notice which stated among other things:

"No person will be allowed to carry on Union organizing activities on the job. Anyone who does so and who thereby neglects his own work or interferes with the work of others will be subject to discharge."

On September 2, 1964, employees McCarty and Haley were discharged for violation of this rule. The fact that they engaged in conduct forbidden by the rule is not contested. The question is the validity of the rule. The Examiner upheld the rule and the Board reversed.

 A no-solicitation rule which only regulates employee activity during working hours is valid unless adopted or used for a discriminatory purpose.[2] The Examiner found, we believe correctly, that there was no evidence of discriminatory promulgation. The Board said that "no one disputes that the notice was initially promulgated in response to union activity." Standing alone, the fact that an organizational campaign may have begun before the rule was posted does not prove a discriminatory purpose. The rule was in effect for at least three and one-half years before any complaint was made. In effect, the Board infers from occurrences in 1964 that the Company had a bad motive in 1960. We do not deem this to be a reasonable inference.

 The Examiner found no discriminatory application of the rule. He did so after denying a proffer of proof by the General Counsel that the rule had been applied discriminatorily. The Board held that the offer should have been received and we agree. The Board went on to hold that discriminatory enforcement was shown by the facts that the Company had condoned solicitations to pay for flowers sent to widows of deceased employees and had on one occasion discussed with a group of employees the handling of Community Chest and Red Cross contributions through payroll deductions. In our opinion these beneficent acts fall far short of establishing forbidden discrimination.

---

* Of the District of Columbia Circuit, sitting by designation.

1. See 161 NLRB No. 17.

2. See Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 803–805, 65 S.Ct. 982, 89 L.Ed. 1372; National Labor Relations Board v. American Coach Company, 10 Cir., 379 F.2d 699, 701; and National Labor Relations Board v. Shawnee Industries, Inc., 10 Cir., 333 F.2d 221, 225.

■■ The holding of the Board that the no-solicitation rule was discriminatorily promulgated and enforced in violation of § 8(a) (1) is reversed and the case remanded for such further proceedings as are appropriate on the issue of the allegedly discriminatory promulgation and enforcement of the rule. This requires that the Board decision that McCarty and Haley were discharged in violation of § 8(a) (1) and (3) be also set aside. If the rule was enforceable, the discharges were proper. Determination of the question of discriminatory discharge must await the reconsideration of the validity of the rule.

## 2. The "Serious Harm" Notice.

The printed notice which contained the no-solicitation rule included the following statement:

"Since the Union has been putting on a campaign to get in here, some of you have been asking questions in regard to the following matters. We have decided to state the Company's position on these subjects as clearly as we can for everybody alike:—

(1) This matter is, of course, one of concern to the Company. It is, however, also a matter of serious concern to you and our sincere belief is that if this Union were to come into this Plant, it would not work to your benefit but to your serious harm."

■ Three circuits have held that this type of notice is non-coercive and is protected by the "free speech" provision of § 8(c).[3] The Board urges that the rule announced should not be applied in the context of threats and other unfair labor practices. This distinction was suggested by the District of Columbia Circuit in Amalgamated Clothing Workers of America v. National Labor Relations Board, 124 U.S.App.D.C. 365, 365 F.2d 898, 910, and in our opinion is valid. Our view is that the notice was proper and was protected by § 8(c) when adopted in 1960 and that the conduct of the Company in 1964 deprived it of that status. In the atmosphere existing in 1964, the notice could well be considered as a threat of reprisal. The inference of the Board that the notice was then a threat violative of § 8(a) (1) is reasonable and the order will be enforced in this regard.

## 3. Refusal to Reinstate Base Shop Employees after Strike.

After the September 2, 1964, discharge of McCarty and Haley, some employees at the base shop walked out and were joined later by others. The strikers authorized a Union representative to make an unconditional offer to return to work on September 8. The Company did not permit them to return until September 9.

The question of whether we are concerned with an unfair labor practice strike or an economic strike is immaterial because no replacements were hired. The Company was obligated to reinstate the strikers when they unconditionally applied for reinstatement.[4] The question is whether the application for reinstatement was unconditional.[5] The offer to return to work on September 8 concluded with this language:

"The union is respectfully demanding that the company cease and desist these unfair practices and to allow all concerned to return to their jobs without any more retaliatory measures be-

3. See Wellington Mill Division, West Point Mfg. Co. v. National Labor Relations Board, 4 Cir., 330 F.2d 579, 583, cert. denied 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88; Surprenant Manufacturing Company v. National Labor Relations Board, 6 Cir., 341 F.2d 756, 758–759; and Amalgamated Clothing Workers of America v. National Labor Relations Board, 124 U.S.App.D.C. 365, 365 F.2d 898, 909–910.

4. National Labor Relations Board v. Foto-chrome, Inc., 2 Cir., 343 F.2d 631, 633, cert. denied 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76.

5. See National Labor Relations Board v. MacKay Radio and Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381; National Labor Relations Board v. Foto-chrome, Inc., supra note 4; National Labor Relations Board v. Brown & Root, Inc., 8 Cir., 203 F.2d 139, 147.

ing taken against them because of their concerted action."

After the Company refused to allow the strikers to return on the 8th, they sent a second message which, among other things said:

"The group desires to work but they want their legal rights respected."

On September 9, they were all back to work.

■ The Company says that the offer to return was conditional and that an acceptance would have been an admission by the Company that it had engaged in unfair labor practices. We do not agree. The offer was not conditioned upon any major concession such as a consent election or the execution of a contract and did not request any change in wages, hours, or working conditions. Of some relevance is the fact that on September 8 the strikers appeared for work at the normal hour and place.[6] The Company's reliance on American Ship Building Co. v. National Labor Relations Board, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855, is misplaced. That case related to a lockout used as an employer weapon to strengthen its bargaining position after impasse in bargaining. The lockout here occurred because the Company did not like the terms of the application for reinstatement. An objective view convinces us that the application was unconditional and the lockout was impelled by a discriminatory motive.[7] The holding of the Board that the lockout violated § 8(a) (3) and (1) is affirmed.

**4. *The Refusal to Reinstate the Firemen.***

■ On September 14, 1964, 57 employees of the Fire and Rescue Department walked off their jobs, assertedly because the Company had refused to hear certain grievances. On September 15 they notified the Company that they would return to work "as long as the Company doesn't create new instances that would cause another disturbance." On September 17 they presented an application suitable to the Company and were back to work on the 18th. The Company says that the September 15 notice was conditional and, hence, it was not bound to accept it. Here again the offer to return was not made contingent upon the grant of any concessions or benefits. For the reasons stated in regard to the base employees, we believe that the request for reinstatement was unconditional and the lockout on September 16 and 17 was discriminatory and a violation of the Act. This portion of the Board's order is affirmed.

**5. *Discharges for Multiple-Badge Wearing.***

In connection with Union organizational activities Union adherents began to wear various insignia signifying allegiance to the Union. These took various forms, such as pencils worn with a union clip showing, plastic badges, improvised badges pasted on plastic buttons, and signs attached to the back of a shirt or jacket. The Company countered with badges indicating that no union was wanted and distributed them to both employees and officials. Some employees then defaced and wore the Company badges. On October 15, 1964, Company supervisors began asking employees not to wear multiple badges. Between October 19 and 20, ten employees were clocked out for refusal to remove multiple insignia. On October 20, the Company posted a notice directing that only one badge be worn. In the next three days, 26 employees were terminated for violation of the notice. On October 27, the badge rule was suspended and everybody went back to work. The whole episode shows an immature approach to labor relations by both the Company and the Union.

6. See Olin Industries, Inc. etc. v. National Labor Relations Board, 5 Cir., 191 F.2d 613, 617, cert. denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332.

7. See National Labor Relations Board v. R. C. Can Company, 5 Cir., 328 F.2d 974, 982.

The right to wear union insignia on the employer's premises during working hours is guaranteed by § 7 [8] in the absence of special considerations.[9] The Company says that special considerations justified its actions.

It first relies on the claim that the buttons were disruptive of harmony among the employees and, hence, under Caterpillar Tractor Co. v. National Labor Relations Board, 7 Cir., 230 F.2d 357, were excepted from the general rule. The Board correctly rejected the argument. The Company itself contributed to the disruption, if any, by distribution of its "no union wanted" buttons. The only showing of disharmony is the testimony of a supervisor without any enlargement as to the time, place, or circumstances of the disharmony. The Company's reference to the carrying by employees of rolled-up newspapers on which the word "scab" appeared is irrelevant because the multiple-badge rule in issue does not purport to cover such activities. The Caterpillar case, Id., 230 F.2d at 359, says that an employer may not restrict "passive inoffensive advertisement of organizational aims." The buttons with which we are concerned fall within this category.

The Company urges that the prohibition of multiple badges was proper to lessen the danger of foreign objects falling into jet engines. Fabri-Tek, Inc. v. National Labor Relations Board, 8 Cir., 352 F.2d 577, 586, holds that danger to plant processes can be a valid reason for restrictions on wearing of union buttons. The facts here do not justify the application of that principle. The Company permitted loose objects to be carried in the front pockets of shirts. It allowed multiple badges to be worn for about three months before taking any adverse action. It distributed its own badges. One employee discharged for violation of the rule pushed a lawn mower rather than repaired a jet engine. The Company fails to convince us that it had real concern over the foreign-object danger.

The Company contends that the rule was necessary in order that the employees present a responsible appearance to the Air Force instead of "looking like a bunch of clowns" because of all the badges. The argument that employees have no right to wear union insignia that are offensive to customers [10] does not apply here. The record shows that the Company acted because of pique and not because of customer relations. It failed to take action against multiple badges for several months and contributed to the carnival atmosphere by the distribution of its own badges.

The claim that the badge wearing was a violation of the no-solicitation rule does not impress us. The courts have generally held that the wearing of union insignia is a form of expression protected by § 7 rather than a form of solicitation.[11] To the extent that Fabri-Tek, Inc. v. National Labor Relations Board, 8 Cir., 352 F.2d 577, 586, holds that badge wearing may be forbidden under a valid no-solicitation rule, we believe that it runs contrary to the Republic Aviation decision.

We agree with the Board that the multiple-badge rule violated § 8 (a) (1) and that the discharges for vio-

8. Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 801–803, 65 S.Ct. 982, 89 L.Ed. 1372.

9. See National Labor Relations Board v. Essex Wire Corp., 9 Cir., 245 F.2d 589, 593; National Labor Relations Board v. Floridan Hotel of Tampa, Inc., 5 Cir., 318 F.2d 545, 548–549; and National Labor Relations Board v. Harrah's Club, 9 Cir., 337 F.2d 177, 180.

10. See National Labor Relations Board v. Harrah's Club, 9 Cir., 337 F.2d 177,

and National Labor Relations Board v. Floridan Hotel of Tampa, Inc., 5 Cir., 318 F.2d 545, 549 (dissenting opinion of Judge Lewis).

11. See Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 802 n. 7, 65 S.Ct. 982, 89 L.Ed. 1372; National Labor Relations Board v. Mayrath Co., 7 Cir., 319 F.2d 424, 426; National Labor Relations Board v. Power Equipment Co., 6 Cir., 313 F.2d 438, 442.

lation of that rule discriminated against the affected employees in violation of § 8(a) (3).

### 6. *The Election Petition.*

■ Between October 1964, and January 1965, there was circulated among the employees a petition requesting that a representation election be conducted by the Board's regional director. Among others engaged in this activity were Klepfer and Huston. The Board finding that they were supervisors and that the Company was charged with responsibility for their acts accords with the principles which we stated in Furr's, Inc. v. National Labor Relations Board, 10 Cir., 381 F.2d 562, 565–566, cert. denied 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105, and is supported by the record.

The Company urges that the Union may not complain of an opportunity to participate in a free election to determine its status. The Board counters with the claim that Company solicitation of signatures to procure a certification election interferes with the employees' § 7 right to choose a union. Neither party supports its arguments by reference to any court decision on this particular point. Neither the rule that the Board will not conduct a representation election at a time when the employer is charged with an unfair labor practice which might affect the election outcome [12] nor the rule that an employer may not seek signatures for a decertification petition [13] is decisive under the facts presented.

■ Like many first-impression decisions, the choice here is difficult and requires consideration of general principles. A union organizational campaign is not carried to fruition overnight. It may continue for a prolonged period. If an employer may induce employees to call an election, it may be able to force an election on a union in the beginning of the campaign and before the union has a real chance to bring its views before the employees. Once an election is lost, the union may not seek another for one year [14] and is barred from organizational picketing for a like period.[15] The Act gives an employer no unrestricted right to secure an election.[16] When these considerations are viewed against a background of animus against the Union and a variety of unfair labor practices, an approval of Company solicitation of signatures to an election petition would permit the Company to profit by its improper actions.[17] We conclude that supervisory sponsorship of the election petition interfered with the employees' § 7 rights and violated § 8(a) (1).

### 7. *The Jet Engine Field Maintenance (JEFM) Layoffs.*

In 1964, it became apparent that the jet engines maintained by the Company would need servicing only half as often as was the practice theretofore. A new contract was negotiated between the Air Force and the Company. In November, eight employees engaged in the JEFM program were terminated. The Board does not dispute the fact that economic considerations caused the layoffs but says that those laid off were discriminatorily selected.

■ Before acting, Company supervisors made a comprehensive rating of affected employees on such bases as seniority, production, attitude towards supervision, and harmony with co-workers. The factors of attitude and harmony are particularly sensitive when applied to leaders in an organizational campaign. Union activity does not entitle an employee to special immunity. At the same time such activity makes difficult the objective rating of any employee by an

12. See Furr's, Inc. v. National Labor Relations Board, 10 Cir., 350 F.2d 84, 85.

13. See National Labor Relations Board v. W. R. Hall Distributor, 10 Cir., 341 F.2d 359, 362.

14. § 9(c) (3).

15. § 8(b) (7) (B).

16. See § 9(c) (1) (B).

17. Cf. Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 704–705, 64 S.Ct. 817, 88 L.Ed. 1020.

employer. All eight men laid off were Union stewards and had been prominent in the activities previously mentioned. An examination of the rating sheets shows that the scores were disregarded rather than applied. On the record presented we must accept the Board's conclusion that the true reason for the selective layoffs was the elimination of active union leadership and violated § 8(a) (3) and (1).

### 8. *The Chodrick Layoff.*

■ A reduction in the number of firemen was made necessary by the closing of Perry Field, one of the auxiliary bases. A rating system similar to that used for the JEFM workers was followed. The employees in the Fire and Rescue Department were represented by an affiliate of the Union and all were Union members. The layoff of Chodrick is said to be discriminatory because he was active in union affairs and had more seniority than some of those retained. No showing is made that seniority had to be observed in the layoffs. The claim of discrimination is not reasonable to us. All the firemen were Union members and necessarily those laid off belonged to the Union. Chodrick was reinstated when the first opening occurred. We conclude that the layoff of Chodrick did not violate § 8(a) (3) and (1) and that as to him the Board's order should not be enforced.

### 9. *Questioning of Employees and Disparagement of the Union.*

■ The Examiner credited testimony of employees that Company supervisors questioned them on their attitude towards the Union, inquired as to the identity of Union organizers and threatened their discharge, and said that union recognition would "jeopardize the jobs of" the plant employees. These occurrences are sufficient under our decisions in Betts Baking Co. v. National Labor Relations Board, 10 Cir., 380 F.2d 199, 201–

202, and National Labor Relations Board v. Midwestern Instruments, Inc., 10 Cir., 264 F.2d 829, 831, cert. denied 360 U.S. 932, 79 S.Ct. 1451, 3 L.Ed.2d 1545, to sustain the Board decision. A review of the entire record convinces us that a violation of § 8(a) (1) occurred.

### 10. *The Refusal to Bargain.*

■ After the Smoke-Eaters Lodge had been certified to represent the employees in the Fire and Rescue Department, the Company unilaterally changed the terms and conditions of employment. Although admitting the § 8(a) (5) violation, the Company pleads that the order with reference thereto should not be enforced because it is now bargaining with the employees' representative. A sufficient answer is that compliance with a Board order is no defense to a petition for the enforcement of that order.[18]

The petition for review is granted and enforcement is denied on the item relating to the discharge of Chodrick. In regard to the no-solicitation rule, the petition is granted, enforcement is denied, and the case is remanded for such further proceedings as may be appropriate in the light of this opinion. See Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221. In all other respects the petition for review is denied and enforcement is ordered. A formal mandate shall issue in accordance with the views herein expressed.

The Company's motion attacking the costs of printing the additional material designated by the Board is denied. The Company has failed to convince us that the material so designated is immaterial. Further, after filing the motion the Company voluntarily deposited the estimated cost of printing the appendices. The Act of July 18, 1966, 80 Stat. 308, permits the taxing of costs to the prevailing party in a civil action brought by or

18. See National Labor Relations Board v. Mexia Textile Mills, Inc., 339 U.S. 563, 567, 70 S.Ct. 833, 94 L.Ed. 1067, and National Labor Relations Board v. Local 101, International Union of Operating Engineers, 10 Cir., 315 F.2d 328, 331.

against the United States after the date of the Act. The petition for review was filed December 12, 1966. In the circumstances the costs are taxed 85% against the Company and 15% against the Board.

WILBUR K. MILLER, Circuit Judge, dissents.