406 F.2d 1017
 70 L.R.R.M. (BNA) 2104
 J. P. STEVENS & CO., Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Textile
Workers Union of America, AFL-CIO, Intervenor (tow cases).
TEXTILE WORKERS UNION OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 11715, 11867, 11718.
 United States Court of Appeals Fourth Circuit.
 Argued April 4, 1968.
Decided Dec. 30, 1968.
 
 W. S. Blakeney, Charlotte, N.C. (Blakeney, Alexander & Machen, Charlotte, N.C., on the brief), for J. P. Stevens & Co., Inc.
 Daniel B. Jordan (Martin Kaufman on the brief), for Textile Workers Union of America, AFL-CIO; and Glen M. Bendixsen, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Clarice R. Feldman, Atty., N.L.R.B., on the brief), for National Labor Relations Board.
 Before BOREMAN, WINTER and BUTZNER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 J. P. Stevens & Co., Inc., and the Textile Workers Union of America, AFL-CIO, petition for review of orders of the National Labor Relations Board issued against the company. The Board cross-petitions for enforcement of its orders.[1] Stevens owns and operates textile mills in a number of states along the eastern seaboard. It has 43 plants in North and South Carolina employing approximately 28,000 people. In May 1963 the union began an organizing campaign in approximately half the company's plants in these two states.
 
 
 2
 This campaign has resulted in numerous unfair labor charges against the company. Stevens I involved the first year of the organizational campaign. The Board found that the company engaged in massive violations of the National Labor Relations Act and discriminatorily discharged 71 employees. The Court of Appeals for the Second Circuit sustained the Board and enforced its order with modifications. J. P. Stevens & Co. v. NLRB, 380 F.2d 292 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). Stevens II embraced the company's conduct from September 1964 through May 1965. The Board found that the company repeatedly violated the Act and unlawfully discharged 18 employees. Again the Court of Appeals for the Second Circuit enforced its order with modifications. Textile Workers Union of America, etc. v. NLRB, 388 F.2d 896 (2d Cir. 1967).[2] Stevens III, one of the cases before us, involves alleged violations of the Act between April 16, 1965 and April 7, 1966.[3] Stevens IV, the other case here, concerns the discharge of three employees in August 1966.[4] In assessing the company's conduct in Stevens III and IV, the Board properly took into consideration the unfair labor practices that Stevens I and II disclosed, and we, in turn, cannot ignore this evidence. Maphis Chapman Corp. v. NLRB, 368 F.2d 298, 303 (4th Cir. 1966).
 
 I.
 
 3
 Stevens III and IV involve charges of discrimination against 27 employees. The Board found that the company violated 8(a)(1), (3), or (4) of the Act[5] by discriminating against 20 employees in five plants. The Board also found no violation in the discharge of seven employees. Although the testimony and the inferences that can be drawn from it often were in sharp conflict, substantial evidence on the record as a whole supports the Board's findings with respect to 26 of these employees, and we enforce the Board's orders concerning them.[6] Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Our review calls for the application of familiar principles of law which were recently restated for this court by Judge Russell in Filler Products, Inc. v. NLRB, 376 F.2d 369, 377 (4th Cir. 1967):
 
 
 4
 '(A) justifiable ground for dismissal of an employee is no defense to an unfair labor charge arising out of such dismissal if such ground was a pretext and not the moving cause for the dismissal. * * * And in determining the reason for such discharge, 'The circumstances of each case (of employee discharge) must be weighed to determine what motivations truly dominated the employer in laying off or discharging the employee.' * * * If there is a conflict in the testimony or in the inferences to be drawn from such testimony, '* * * we must uphold 'the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."'
 
 
 5
 The company's complaint that 'the rulings of the Board place this company in the position of being unable to discharge or discipline an employee, no matter what his failures may be-- if only he shows to the Board that he is connected with the Union' is refuted by the record. For example, the Board upheld the trial examiner's finding that the company did not violate the Act in discharging Thomas O. Simpson, a company employee for 12 years, who was responsible for the production of a large amount of underweight material. Although Simpson was a member of the union, the trial examiner said, 'I fail however to find evidence to support a conclusion that union activity was the cause, and believe this discharge would have been made if Simpson had not been a union adherent.' Four other employees, Allison, Evans, Hawthorne, and McAlexander, were not merely union supporters. Three of them testified in Board proceedings, and one served as a union election observer. Nevertheless, the trial examiner and the Board held that they had not been discriminatorily discharged.
 
 
 6
 The company urges as the 'crucial injustice' that 'the Examiner and the Board moved on by main strength to the 'inference' of unlawfulness and guilt-- turning indifferently away from the explanation favorable to the company, systematically rejecting or ignoring it, as if it had never been brought forward at all.' Again we find the record considered as a whole refutes this indictment. The Board accepted the company's explanation in upholding the discharge of seven union members. Frequently, however, the Board found the company's factual claims were contrary to the weight of credible evidence, but this in itself provides no ground for us to reject the Board's decision. NLRB v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); see NLRB v. Pittsburgh S.S. Co., 337 U.S. 656, 659, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949).
 
 
 7
 We conclude, however, that evidentiary support is lacking for the Board's decision that David S. Beam was unlawfully discharged. The trial examiner failed to find sufficient evidence in the record to support the allegation that Beam was discharged for his union activities. The Board reversed. Before Beam joined the union, he received two written reprimands. The first recited that Beam kept leaving his job. The second related to the production of bad beams and warned that any more would result in discharge. On March 5, 1965, Beam admittedly produced another bad beam. After March 5, the company learned of Beam's union affiliation. On April 1, the bad beam was discovered in an area where good beams are stored, and Beam was discharged.
 
 
 8
 The Board emphasized that although the bad beam was produced on March 5, Beam was not discharged until April 1. Relying upon the fact that the company keeps an inventory on the beams in storage and an overseer checks them daily, it concluded that the company knew of the bad beam on March 5 but took no action until it learned of Beam's union activities. The evidence, however, does not disclose company knowledge of this defective material before April 1. Beam himself failed to report the incident and he attached a ticket to the work which failed to indicate that it was defective. The trial examiner discredited an employee, Miles, who claimed to have marked the beam 'bad' when he put it in the storage area. In any event, the trial examiner properly concluded that Miles' testimony was of no great consequence in light of the admitted fact that Beam had produced the defective material after being warned that this would result in discharge. We conclude that the company did not wrongfully seize upon Beam's failure to perform his duties and use it as a pretext for discharging him.
 
 II.
 
 9
 The Board, with minor modifications, adopted the trial examiner's findings in Stevens III that the company frequently violated 8(a)(1) of the Act. Prohibited conduct included threats of reprisals, promises of benefits, interrogation, creating the impression of surveillance, enlisting employees for surveillance, and attempting to coerce an employee to remove union insignia. These findings of 8(a)(1) violations are supported by substantial evidence on the record considered as a whole.
 
 
 10
 We decline, however, to enforce the Board's order with respect to one of the 8(a)(1) charges. The company posted a notice which said, among other things: '(The union campaign) is, of course, one of concern to the company. It is also, however, a matter of serious concern to you and our sincere belief is that if this Union were to get in here, it would not work to your benefit, but in the long run, would itself work to your serious harm.'
 
 
 11
 This notice has been widely used by employers in organizational campaigns, and courts differ on its validity.[7] We have held on several occasions that similar statements do not violate 8(a)(1), and we adhere to our previous rullings. NLRB v. Greensboro Hosiery Mills, Inc., 398 F.2d 414 (4th Cir. 1968); NLRB v. Kayser-Roth Hosiery Co., 388 F.2d 979 (4th Cir. 1968); Wellington Mill v. NLRB, 330 F.2d 579, 583 (4th Cir. 1964), cert. denied, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1965); NLRB v. Threads, Inc., 308 F.2d 1 (4th Cir. 1962).
 
 III.
 
 12
 In addition to the usual order requiring reinstatement and restitution, and the usual cease and desist order, the Board in Stevens III directed the company to post appropriate notices for 60 days at all of its plants in North Carolina and South Carolina; to mail a copy of the notice to each employee; to grant the union, upon request, reasonable access to the company's bulletin boards for a period of one year; and in the plants where the unfair labor practices had occurred, to read, or allow a Board agent to read, the notice to employees during working time.[8] Similar remedies were enforced in Stevens I and II.[9] We are in accord with the reasons assigned in those cases. The unfair labor practices disclosed in Stevens III and Stevens IV are a continuation of the unfair labor practices condemned in Stevens I and II. This in itself is relevant in framing an appropriate order. NLRB v. Lundy Mfg. Co., 316 F.2d 921, 924 (2d Cir.) cert. denied, 375 U.S. 895, 84 S.Ct. 171, 11 L. Ed.2d 124 (1963). The extended period of time during which the company has persistently violated the Act, the varied forms which the violations have taken, and the fact that the company has discriminated against more than 100 employees in about half its plants in North Carolina and South Carolina demonstrate that the Board's order, although unusually broad, is not an abuse of discretion. Cf. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 13 LEd.2d 233 (1964); Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). As the Court said in Phelps Dodge Corp. v. NLRB,313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941):
 
 
 13
 'In the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy. On the other hand, the power with which Congress invested the Board implies responsibility-- the responsibility of exercising its judgment in employing the statutory powers.'
 
 
 14
 In Stevens IV the Board, as an additional remedy, required the company, at the request of the union made within one year, to furnish the union a list of the names and addresses of all employees in its plants in North Carolina and South Carolina. This order is not found in Stevens III. A similar remedy was sought in Stevens II, but enforcement was denied on the ground that it was not designed to effectuate the policies of the Act. Textile Workers Union of America, etc. v. NLRB, 388 F.2d 896, 905 (2d Cir. 1967). There the court relied on NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), which denied non-employees access to the company's property for distribution of union literature. In rejecting the Board's argument that furnishing the list of employees would enable the union to contact all employees outside the plant and make known its views in an atmosphere relatively free of restraint and coercion, the court emphasized that 'the policies of the Act call instead for a change in the plant's atmosphere.' Textile Workers Union of America v. NLRB, 388 F.2d 896, 906 (2d Cir. 1967). But in Stevens III and IV, in spite of the Second Circuit's enforcement of remedies which should have been effective, the company has persisted in maintaining an anti-union atmosphere in its plants. The examiner and the Board expressly found in Stevens IV that the company's unfair labor practices were a continuation of the pattern revealed earlier. Even if a list of company employees is deemed to be the sole property of the company, dictum found in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679 (1956), is applicable:
 
 
 15
 'This is not a problem of always open or always closed doors for union organization on company property. Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other. The employer may not affirmatively interfere with organization; the union may not always insist that the employer aid organization. But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize.
 
 
 16
 'The determination of the proper adjustments rests with the Board. Its rulings, when reached on findings of fact supported by substantial evidence on the record as a whole, should be sustained by the courts unless its conclusions rest on erroneous legal foundations.'
 
 
 17
 We believe the Board's findings set forth in Stevens II,[10] coupled with the unfair labor practices found in Stevens III and IV, show that requiring the list is reasonably designed to facilitate union communication with employees in the face of surveillance and other difficulties imposed by the company. NLRB v. Hanes Hosiery, 384 F.2d 188 (4th Cir. 1967), required the production of a list of employees who were eligible for a scheduled certification election. Though the reasons for furnishing the list were quite different, company objections to placing a list of employees in the hands of the union were discussed and answered there in a way relevant to our case.
 
 
 18
 The Board's order, however, will be modified to limit the list of employees to those working at the three plants involved in Stevens IV.[11] We impose this limitation because the Board has not asked for the order in Stevens III and because it has not made findings of fact that the channels of communication are obstructed in all of the company's 43 plants in North and South Carolina.[12]
 
 
 19
 The several petitions and cross-petitions are granted in part and denied in part.
 
 
 20
 BOREMAN, Circuit Judge (concurring in part and dissenting in part):
 
 
 21
 I find it necessary to disagree with certain portions of the majority opinion, principally in the area of enforcement of 'remedial' provisions of the Board's order.
 
 
 22
 First, however, I state my agreement with that portion of Judge Butzner's opinion which pertains to the notice or declaration of company attitude toward unionization of its plants. It is clear that Stevens does not look with favor upon such unionization, as evidenced by its notice to employees which was posted on the bulletin board. Similar notices and statements have been held by this court on several occasions to be nonviolative of section 8(a)(1) as noted by Judge Butzner. There is conflict among the circuits on this question but, notwithstanding this court's repeated statements of its position, the Board has steadfastly refused to recognize and respect the decisions of this court. Instead, in cases recurring in this circuit where this question arises the Board persists in finding such a company declaration of attitude as violative of the Act. I agree with Judge Butzner's summarization that 'We adhere to our previous rulings.'
 
 
 23
 It is apparent that the Board issued some very unusual and extreme directives against Stevens, not only in these cases but in Stevens I and Stevens II. The Company states its complaint concerning the attitude and action of the Board in the following language:
 
 
 24
 'In the view of the Board, identical results follow automatically from the Board's self-generated momentum in the first Stevens case-- a case in which the Board, over a period of months, heard 443 witnesses testifying on a multitude of disputed and material factual issues, and upon such conflict never once found any witness for the Company to be telling the truth or any witness for the Union or the Board to be telling anything but the truth.'
 
 
 25
 The reference to 443 witnesses is amplified in a footnote to the company brief by a statement that a majority of these witnesses testified for the Company. They included not only supervisors and representatives of management, but rank and file employees and persons unconnected with the Company.
 
 
 26
 In referring to the 'remedies' directed by the Board and imposed upon Stevens, in the first instance, the Company calls attention to the facts that when these directives were issued against Stevens in the first case they had not been requested by any party to the case; they had not been recommended or suggested by the Board's trial examiner; prior to ordering them, the Board did not give any notice or hold any hearing or invite any discussion or argument, on any question as to whether these remedies or any like them would be appropriate or should be considered in that case, or in any case.
 
 
 27
 The Board would require that, with regard to the notice to employees as prescribed by the Board, the notice shall be posted on the bulletin board, read to the employees, and mailed to them at their homes. The question naturally arises: Why such triplicate 'notification'? After the notice has been placed on the bulletin boards where the employees regularly read posted notices do they need, or do they desire, to receive exactly the same notice, without any explanation, at their homes? The Board would further require that when the employees return to the plant they are to be taken off their jobs and the same notice read to them again. The Company charges, and not without justification, that after a proper posting of the notice has been accomplished the Board's purpose beyond that is not notification but appears to be simply the placing of the Company in as many different postures of obeisance as the Board can devise.
 
 
 28
 Perhaps the most dramatic of these directives is the requirement that the company officials shall assemble the employees 'during working time, by departments and by shifts,' and read to them the notice or declaration as dictated by the Board. This declaration is essentially, in form, a confession of guilt. The impression on any audience would be that the employer is being forced to orally confess that he has broken the law and is being required to declare that he will not do so again. In my view this is an amazing edict to be handed down by an agency of our Government. Here an administrative arm of the Government orders such a declaration and directs that it be made before assemblages of fellow citizens. Even the convicted felon can never be made to confess that he has violated the law and he can, and often does, deny guilt; indeed, at every opportunity he may proclaim that he has been unjustly convicted.
 
 
 29
 The forcing of such declarations, in the nature of confessions or recantations, is not a matter to be lightly regarded. The feeling and the resolution of free men against forced utterances can become extremely intense. Over many centuries they have suffered oppressions rather than admit wrongdoing which they deeply and devoutly believed they had not committed. In these newly devised directives of the Labor Board there appears to be an ominous trend, whether so intended or not, toward old oppressions, the eroding of fundamental rights and freedoms. Mr. Justice Brandeis, dissenting in Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928), observed that:
 
 
 30
 '* * *. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.'
 
 
 31
 Justice Learned Hand clearly expressed the thought in the following terms:
 
 
 32
 '* * *. Forcibly to compel anyone to declare that the utterances of any official, whoever he amy be, are true, when he protests that he does not believe them, has implications which we should hesitate to believe Congress could ever have intended. * * * We can very well understand the sense of outrage which anyone may feel at being forced publicly to declare that he has committed even a minor dereliction of which in his heart he does not believe himself guilty.' Art Metals Construction Co. v. N.L.R.B., 110 F.2d 148, 151 (2 Cir. 1940).
 
 
 33
 At the time these cases came before us the two courts, other than the Court of Appeals for the Second Circuit, which had considered this reading-of-notice directive, strongly disapproved it. The United States Courts of Appeals for both the Fifth Circuit and the District of Columbia Circuit are in disagreement with the Second Circuit on the subject.
 
 
 34
 'The requirement of the Recommended Order that the Notice be read by management to any employee who requests it, as amended by the Board to require it be read to each employee, singly or collectively, is unnecessarily embarrassing and humiliating to management rather than effectuating the policies of the Act.' N.L.R.B. v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 869 (5 Cir. 1966).
 
 
 35
 Noting the decision of the Second Circuit in Stevens I (denying enforcement of the Board's directive concerning reading of the notice) the Court of Appeals for the District of Columbia stated:
 
 
 36
 '* * *. The ignominy of a forced public reading and a 'confession of sins' by any employer, any employee, or any union representative makes such a remedy incompatible with the democratic principles of the dignity of man.' International Union of Electrical, R. & M. Wkrs., etc. v. N.L.R.B., 127 U.S.App.D.C. 303, 383 F.2d 230, 234 (1967), cert. den. sub nom., Scott's, Inc. v. N.L.R.B., 390 U.S. 904, 88 S.Ct. 818 (1968).
 
 
 37
 Beyond 'democratic principles' there is here involved the ultimate principle of individual liberty and freedom guaranteed to every citizen by our Constitution against the encroachment of any and all power, including that of government itself. In the present case the Board has adopted an 'option' prescribed by the Second Circuit in Stevens II, namely that the reading of the notice to the employees amy be done 'by either a Board agent or Company official.' If, however, the Company must assemble its employees and open its premises to an agent of the Labor Board who stands and reads the employer's declaration, the true nature of the situation is neither altered nor disguised. The forced statement of the employer is simply being spoken publicly for it by an agent. Certainly, also, on such a stage the Government is being cast in an entirely new and most unflattering role as its delegate solemnly declaims, before the employees, a statement as commanded from the employer, which is in truth not a voluntary statement of the employer at all, but a compelled declaration. The Court of Appeals for the District of Columbia specifically considered this 'option,' as approved by the Second Circuit, and rejected it.
 
 
 38
 '* * *. Board involvement in a reading of the order would inescapably draw the Board into the very conflict areas it should remain aloof from, except for the need to judge.' International Union of Electrical, R. & M. Wkrs., etc. v. N.L.R.B., 127 U.S.App.D.C. 303, 383 F.2d 230, fn. 5, p. 233 (1967), cert. den. (supra).
 
 
 39
 In my view the reading of the notice, as ordered, cannot fairly be said to effectuate the purposes and policies of the Act. It is not remedial in the true sense but is simply penalizing in nature.
 
 
 40
 In these cases before us the Board has directed, and my brothers would enforce, a still further 'remedy,' that is, that Stevens shall give the Union 'access' to all the bulletin boards in all the company's plants in North Carolina and South Carolina 'for a period of one year.' In this directive the Board has taken leave of any concept of requiring the Company to disavow unfair labor practices in the future. Obviously, the nature or purpose of this directive is simply to aid the Union in its organizing efforts among the company's employees, to require the Company to furnish such aid to the Union by turning over property and facilities within its plant in the midst of its employees while they are at work, and on a continuing basis for a period of a year.
 
 
 41
 In its Decision and Order in the present cases, the Board has said nothing whatever in justification or support of this directive. It may be pertinent to consider whether the Board did so in the earlier Second Circuit 'Stevens cases.' In Stevens I the Second Circuit held that the Board had made no showing justifying such an order. J. P. Stevens & Co. v. N.L.R.B., 380 F.2d 292, 305 (2 Cir. 1967). In Stevens II the record appears to have contained nothing whatever on this subject yet the court, in that case, upheld this directive after having expressly disapproved it in Stevens I.
 
 
 42
 The Board now relies on the decision of the Second Circuit in Stevens II and thus it is in order to analyze briefly what the situation was on this question in Stevens II. There the court said:
 
 
 43
 '* * *. In the case before us, the Board contends that Union access to the bulletin boards is necessary in order to offset the Company's use of the boards in its campaign of coercion and in the posting of lists of employees who had joined the Union, the names of those employees who withdrew being 'scratched' from the lists. We think that in view of the Company's use of the boards in combatting the Union, giving the Union reasonable access to them will effectuate the purposes of the Act, in that it will help to restore to the employees the opportunity to hear all viewpoints. We will therefore enforce this portion of the order.' Textile Workers Union of America, etc. v. N.L.R.B., 388 F.2d 896, 905 (2 Cir. 1967).
 
 
 44
 In Stevens II in which the last above quoted language appears, there was nothing in the record to show any use of the plant bulletin boards in 'combatting the Union.' In Stevens I there had been evidence that on the bulletin boards in some of the plants a statement of the Company's position regarding unionization had been posted and further evidence that in certain of these plants there had been posted copies of company letters in reply to employees who had written to the Company giving notice of their union affiliation. There had otherwise been no evidence at any time of any 'posting of lists of employees who had joined the Union,' or any evidence that the Company ever had any connection with any 'scratching,' at any location, of the names of any employees who withdrew from the Union. As to restoring to the employees the opportunity to hear all viewpoints it does not appear from the evidence that there was any real lack of such opportunity. On the contrary, the record in all of these cases is replete with references to repeated and continuous contacting of employees by union representatives around the plant premises, at the employees' homes, at union meeting halls, and through leaflets, letters, telephone calls, visits and assemblages. Upon the evidence in Stevens I of the Company's use of the bulletin boards the Second Circuit rejected the directive in question. Yet, in Stevens II, with nothing in the record on the subject, the court approved what it had previously disapproved.
 
 
 45
 In the present case, without showing or saying anything on the subject, the Board simply issues this directive and asks this court to approve and enforce it. Moreover, the Board here again asks the application of this directive to all of the Company's plants in North Carolina and South Carolina, most of which have never been touched by a single word of evidence in any of these cases. There is nothing to show the names or locations of all of these plants. There is nothing to show that there has ever been any intimation of any union organizing effort at most of those plants. There is no showing or indication that the Company, or any company representative, has ever said anything about the Union to any employee in any of those unaffected plants at any time. Yet, these plants, just as the plants in which unfair labor practices are alleged and have been found to have occurred, are ordered to turn over to the Union all their bulletin boards for a period of one year. The Board does not make even a casual effort to define or limit the nature of the material which the Union may place on the company bulletin boards, the quantity thereof, or the frequency of the union representative's access to the bulletin boards. What would be 'reasonable' union uses of the bulletin boards under all the varying circumstances of plant operations are indeed matters on which 'reasonable,' yet thoroughly genuine, disagreements would almost inevitably occur. Controversy over such questions could produce a veritable tangle of litigation unless the Board could persuade the courts, as it now seeks to do, to leave all such matters to the Board's discretion, unfettered and unbridled.
 
 
 46
 It is an unrealistic assessment of the situation to say merely that the question is one of allowing the Union access to space on the Company's bulletin boards. By means of what it might place in front of employees while at their work, the Union could excite them, arouse them, distract them, and create widespread deterioration of morale and performance in the company plants. As a practical matter this directive, if enforced, could conceivably place in the hands of the Union a very large measure of control over company operations and over the success or failure of such operations.
 
 
 47
 The Company argues that it never had any opportunity to argue or present its position with reference to the issued directives and no indication whatever that the Board was considering any such 'remedy' directives as it has in fact issued. Perhaps it might have been in vain for the Company to have argued property rights to the Board, pointing out that the 'right of property' is a cornerstone of any free society and that the Constitution of the United States provides that neither federal nor state government (and therefore no arm or agency of either) may invade one's property without due process of law.
 
 
 48
 'It (the Act) does not require that the employer permit the use of its facilities for organization when other means are readily available.' N.L.R.B. v. Babcock & Wilcox Co., 351 U.S. 105, 114, 76 S.Ct. 679, 685.
 
 
 49
 On the whole subject of remedies the Board deems that it has a wide latitude to 'tailor' and devise orders which will effectuate the policies of the Act and that in this it has developed superior talents and discernments which have generally come to be referred to as administrative 'expertise.' The first and basic caveat with respect to this proposition is that, if accepted at face value, it would mean that the power of the Board is virtually limitless. As becomes apparent in the present cases there is virtually nothing that the Board might not require of an employer in the guise of 'tailoring' a remedy. But the Act does not itself give any presumptive validity whatever to 'remedy' devising by the Board. The presumption of validity, accorded by the Act to the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole, is not provided with respect to Board decreeing of remedies. 'Remedy' directives are left within the judgment and discretion of the court, the court weighing and appraising them for itself and 'enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board' as the court may see fit. 29 U.S.C. 160(e). This consideration is of particular force where, as here, the remedy directives are innovations and, as the Board itself recognizes, beyond the 'conventional.' As has been pointed out, the Company has never presented, nor has it been afforded any occasion to present, to the Board the arguments which it presents to the court. Courts should not be too ready to relax their scrutiny or too willing to agree that the judicial function is largely preempted when the Board raises the magic talisman of 'expertise' in the support of a claimed exclusive right to 'tailor' a remedy. As was stated by the Supreme Court in Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962):
 
 
 50
 '* * *. Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion."
 
 
 51
 Again, in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490, 71 S.Ct. 456, 466, the Court issued a warning in the following language:
 
 
 52
 'Reviewing courts must be influenced by feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds.'
 
 
 53
 In N.L.R.B. v. Ford Motor Co., 119 F.2d 326, at 330 (5 Cir. 1941), the court stated:
 
 
 54
 'Nothing in the statute, nothing in any of the decisions lends countenance to the view that Congress intended to make of the Circuit Courts of Appeals mere rubber stamps, mere perfunctory executors of the Board's unrestrained will. They make the contrary quite clear. It is, therefore, for this court, in the performance of its function under the statute, to say not blindly but in the exercise of an informed discretion, first, whether the findings are supported by the evidence, and, second, whether the Board's orders are appropriate under the statute.'
 
 
 55
 In the same vein, although in a case factually impertinent, the Supreme Court of the United States has used the following language:
 
 
 56
 '* * *. We have said that 'this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.' We have said that the power to command affirmative action is remedial, not punitive. * * *.
 
 
 57
 'In that view, it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any syatem of penalties which it would deem adequate to that end.'[1]
 
 
 58
 Next, as an additional 'remedy,' the Board has ordered the Company to furnish the Union, at the Union's request made within one year, a list of the names and addresses of all employees in its plants in North Carolina and South Carolina. This directive, in my view, could have but one principal objective, that is, to assist the Union in its organizing campaign to unionize the employees. Such is not an authorized function of the Board within the policy and intendment of the Act. In theory, at least, the Board acts in an impartial capacity, although it is charged with the duty to protect the rights of eligible employees to join a union if they so desire and to freely choose a bargaining representative without hindrance or interference.
 
 
 59
 My brothers order enforcement of this directive only with respect to lists of employees working at the three plants involved in Stevens IV. I am not persuaded that the Board has authority to order the Company to furnish such lists except, perhaps, as in N.L.R.B. v. Hanes Hosiery, 384 F.2d 188 (4 Cir. 1967), where this court required the production of a list of employees eligible to vote in a scheduled certification election.
 
 
 60
 We cannot assume that every employee in the plants involved in Stevens IV desires to join a labor union. On the contrary, there are undoubtedly many who have no such desire or intention. Those who favor unionization seem to have no difficulty in spreading the word among vast numbers of employees who comprise the working force in a given plant that an organizing campaign is under way. Experience teaches that employees, who favor the union quickly disseminate information, contact their fellow employees, have a plentiful supply of union membership cards ready for signature, solicit members, obtain recruits, invite and urge attendance at union meetings, etc. The news of the campaign spreads like wildfire. Each employee is entitled to his own opinion without being unduly pressured by either side. Those who are opposed to the movement are entitled to be shielded and protected against efforts of trained, professional organizers to personally contact them in the privacy of their homes, to annoy and harass them by repeated telephone calls, personal letters, and in other conceivable ways during a heated campaign for union support. The employer should not be required to expose its employees to such procedures which are ofttimes annoying, embarrassing and, in many instances, actually engender ill feeling and strife between and among those employees who favor the union and those who do not.
 
 
 61
 These lists of employees are the property of the Company; they are private records required to be kept by the employer and without which it could not successfully operate. I would deny enforcement of this directive even as modified by the majority.
 
 
 62
 Except in the respects hereinbefore indicated I join in the opinion prepared for the court by Judge Butzner.
 
 WINTER, Circuit Judge (specially concurring):
 
 63
 Except for Paragraph II-- the portion of the opinion which relates to the 'serious harm' notice in Stevens III-- I agree wholeheartedly with the language of Judge Butzner's opinion and the manner in which it disposes of these cases. With this exception, I concur in the opinion. As to the 'serious harm' notice, I would enforce those portions of the Board's order which would require Stevens to cease and desist from posting the notice and require Stevens to post a notice that it would not henceforth post or mail notices saying that 'a union will operate to your serious harm if it gets into the plant.'
 
 
 64
 For reasons convicingly stated by Judge Sobeloff in his special concurrence in N.L.R.B. v. Kayser-Roth Hosiery Co., 388 F.2d 979, 981 (4 Cir. 1968), there comes a time when constitutionally protected speech may lose its shield of inviolability by reason of abuses in its exercise. In Stevens III that time is at hand. The flagrant, systematic and widespread 8(a)(1), (3) and (4) violations which were committed in Stevens, I, II, III and IV, and the fact that at least the Board has found that Stevens has not brought itself into full compliance with the Act in Stevens V, make apparent that, rather than a constitutionally and statutorily protected expression of opinion (8(c)), Stevens' statement to its employees that a union would operate to their 'serious harm' was a threat to intimidate its employees and deny them their 7 rights-- a threat carried out when the employees persisted in their efforts to organize.
 
 
 65
 It is true that in N.L.R.B. v. Threads, Inc., 308 F.2d 1, 9 (4 Cir. 1962), and in Wellington Mill, etc. v. N.L.R.B., 330 F.2d 579, 583 (4 Cir. 1964), cert. den., 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1965), we characterized what was said as 'unqualifiedly privileged.' The characterization was made, in each instance, where there was lacking the history of repeated and extensive employer misconduct to deny employees their 7 rights, present in the case at bar. Threads and Wellington thus hold only that the 'serious harm' language standing alone is not violative of employees' rights. In Kayser-Roth, supra, we were unwilling to dispose of the contention that the 'serious harm' language was violative of 8(a)(1), without considering the circumstances surrounding its use, and even more recently in N.L.R.B. v. Greensboro Hosiery Mills, Inc., 398 F.2d 414 (4 Cir., 1968), in which Judge Butzner unqualifiedly concurred, we strongly intimated that a 'serious harm' notice could violate the Act 'by virtue of accompanying circumstance.' These later expressions are an aspect of the doctrine, firmly established in this Circuit, that any statement, not inherently coercive, may become such when measured in the context of the circumstances in which it was made, i.e., N.L.R.B. v. McCormick Concrete Co., 371 F.2d 149 (4 Cir. 1967). While we may have disagreed with the Board in the past that a 'serious harm' notice is inherently coercive, we should not consider ourselves foreclosed from holding one to be coercive when the overwhelming evidence of the surrounding circumstances unerringly points to that result.
 
 
 
 [1]
 The proceedings in Nos. 11,715 and 11,867 were consolidated for hearing before the trial examiner and the Board. J. P. Stevens & Co., 167 NLRB No. 37, 66 LRRM 1024 (1967). The combined case is termed Stevens III. The proceedings in No. 11,718 were conducted before a different trial examiner. J. P. Stevens & Co., 167 NLRB No. 38, 66 LRRM 1030 (1967). This case, Stevens IV, was consolidated with Stevens III for argument in this court
 
 
 [2]
 On motion of the union, this court transferred petitions in Stevens I and II to the Second Circuit, where a petition for the union in Stevens I had previously been filed. Motions to transfer Stevens III and IV were denied. J. P. Stevens & Co. v. NLRB, 388 F.2d 892 (4th Cir. 1967)
 
 
 [3]
 The portion of the Board's order setting aside the second election and ordering a third election is not before the court in this proceeding. Holly Hill Lumber Co. v. NLRB, 380 F.2d 838, 840 (4th Cir. 1967)
 
 
 [4]
 Stevens V, arising out of an organizational campaign beginning in August 1967, was decided by the Board on June 12, 1968. J. P. Stevens & Co., 171 NLRB No. 163, 69 LRRM 1088
 
 
 [5]
 29 U.S.C. 158:
 '(a) It shall be an unfair labor practice for an employer-- '(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 * * * *.hal
 '(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *. ' (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.'
 
 
 [6]
 The unlawfully discharged employees are: from the Dunean plant, Greenville, S.C., Robert W. Arrowood, Talmadge C. Clardy, Billy Davis, Amos E. Fendley, Mrs. Amos E. Fendley, James E. Griggs, Jack H. Hembree, Mrs. Jack H. Hembree, Jackie Holbrooks, Aubrey Kent, and J. T. E. Moore; from the Rosemary plant, Roanoke Rapids, N. C., Lloyd A. Boyd, Mrs. Maurine Hedgepeth, and John Love; from the Roanoke No. 2 plant, Roanoke Rapids, Herbert King; from the Delta No. 4 plant at Roanoke Rapids, Norman Shearin; and from the Republic No. 3 plant at Rock Hill, S.C., Mrs. Ollie Varnadore
 Employees unlawfully subjected to other discrimination are: from the Dunean plant, James E. Griggs (denial of overtime), Robert Hamblin (demotion), and Calvin E. James (denial of overtime and promotion).
 The company did not violate the Act with respect to the determination of employment of these employees for whose reinstatement the union petitions: from the Dunean plant, Danny Allison, Richard Evans, William R. Hawthorne, Mrs. Doris Waldrop, and J. B. Wilson; from the Estes plant, Piedmont, S. C., Thomas O. Simpson; from the Patterson plant at Roanoke Rapids, Coy McAlexander.
 
 
 [7]
 The identical notice was held coercive by the Second Circuit in Stevens I, J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 302 (2d Cir. 1967); accord, Serv-Air, Inc. v. NLRB, 395 F.2d 557, 561 (10th Cir. 1968); see NLRB v. Southwire Co., 352 F.2d 346, 348 (5th Cir. 1965). Contra, Surprenant Mfg. Co. v. NLRB, 341 F.2d 756, 758 (6th Cir. 1965); cf. Amalgamated Clothing Workers, v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898, 909 (1966)
 
 
 [8]
 The union also requested access to the company's parking lots and an opportunity to answer under similar circumstances any anti-union speech. These requests the Board denied, and the union does not seek review of this action
 
 
 [9]
 J. P. Stevens & Co. v. NLRB, 380 F.2d 292 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564 (1967) (Stevens I) and Textile Workers Union of America, etc. v. NLRB, 388 F.2d 896 (2d Cir. 1967) (Stevens II). The Board's order giving the union access to the company's bulletin board was denied enforcement in Stevens I. It was later enforced by the same court in Stevens II, after a Board showing that the company was using the bulletin boards for anti-union purposes. See NLRB v. H. W. Elson Bottling Co., 379 F.2d 223, 226 (6th Cir. 1967) and Scott's Inc., 159 NLRB No. 146, 62 LRRM 1543, 1549 (1966), enforced subnom., International Union of Elec., Radio & Mach. Workers v. NLRB, 127 U.S.App.D.C. 303, 383 F.2d 230 (1967), cert. denied, Scott's Inc. v. NLRB, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968)
 This court has enforced oral notice of a Board order but without comment. Taylor-Collquitt Co., 47 NLRB 225, 12 LRRM 5, enforced, 140 F.2d 92 (4th Cir. 1943). Other circuits have declined to enforce a reading requirement. International Union of Elec., Radio & Mach. workers v. NLRB, 127 U.S.App.D.C. 303, 383 F.2d 230, 232 (1967), cert. denied, Scott's Inc. v. NLRB, 390 U.S. 904, 88 S.Ct. 818 (1968); NLRB v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 869 (5th Cir. 1966); cf. Jackson Tile Mfg. Co., 122 NLRB No. 94, 43 LRRM 1195, 1200 (1958), enforced, 272 F.2d 181 (5th Cir. 1959).
 Authority for enforcing the Board's posting order in all plants in Heck's Inc., 159 NLRB No. 104, 62 LRRM 1473 (1966), enforced, 387 F.2d 65 (4th Cir. 1967); see NLRB v. Lummus Co., 210 F.2d 377, 381 (5th Cir. 1954). Contra, Reliance Mfg. Co. v. NLRB, 125 F.2d 311, 321 (7th Cir. 1941).
 Support for the mailing order is found in International Union of Elec., Radio & Mach. Workers v. NLRB, 127 U.S.App.D.C. 303, 383 F.2d 230, 232 (1967), cert. denied, 390 U.S. 904, 88 S.Ct. 818 (1968). See NLRB v. United Brotherhood of Carpenters & Joiners, 321 F.2d 126, 129 (9th Cir.), cert. denied, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963).
 
 
 [10]
 J. P. Stevens & Co., 163 NLRB No. 24, 64 LRRM 1289, 1291 (1967):
 "The record also shows that the Respondent carried on a long campaign of illegal intimidation and unlawful discharge of those employees who were actively soliciting for the Union. The Respondent's efforts to eliminate those Union members who might recruit others to the Union banner were, as the Trial Examiner herein indicated, largely successful; in some departments where there once had been a number of Union supporters, not one was left. They had been discharged, or withdrew from the Union because of fear of reprisals. Meanwhile, antiunion employees were free to talk about the Union during working hours.
 "In these circumstances, we believe that a simple cease and desist order will not suffice, for it would be unrealistic to believe that such an order could retrieve the employees' thwarted rights of self-organization or restore the Union to its previous position where it was able to make known its views and solicit memberships with the help of employee members within the plant. Few, if any, Union supporters are left, and those who might espouse the Union cause, such as reinstated employees who previously had been discharged for the union activity, would probably be afraid to promote the Union for fear that they would be discharged again. The atmosphere of fear generated by the illegal threats, interrogations, and discharges in the plant undoubtedly will hinder lawful propaganda activities during nonworking time on company premises. We note, furthermore, that union organizers ordinarily have no right of access to the plant and that, so far as the record shows, this Union now has no other effective means of personally contacting all of the Respondent's employees. Accordingly, we have decided to grant the Charging Party's request that the Respondent be required to supply the Union, upon request made within 1 year, with the names and addresses of all employees in its North and South Carolina plants. This will enable the Union to contact all employees outside the plant and make known its views in an atmosphere relatively free of restraint and coercion. An the Respondent was responsible for the unfair labor practices in the plants and for the attendant lack of organizational opportunities, and as all the employees' names and addresses are not available from sources other than the Respondent, we think it reasonable to require it to furnish the list."
 
 
 [11]
 Those plants are Dunean, Greenville, South Carolina; Republic No. 3, Rock Hill, South Carolina; and Rosemary Delta #4, Roanoke Rapids, North Carolina
 
 
 [12]
 In Stevens V the Board required the company to furnish a list of employees only in those plants where unfair labor practices had been found. J. P. Stevens & Co., 171 NLRB No. 163, 69 LRRM 1088 (1968)
 
 
 [1]
 Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, at pages 11 and 12, 61 S.Ct. 77, at page 79, 85 L.Ed. 6