638 F.2d 676
 106 L.R.R.M. (BNA) 2145, 90 Lab.Cas. P 12,469
 J. P. STEVENS & CO., INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Amalgamated Clothing and Textile Workers Union, AFL-CIO,
CLC, Petitioner/Intervenor.
AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION, AFL-CIO,
CLC, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
J. P. Stevens & Co., Inc., Petitioner/Intervenor.
 Nos. 79-1624, 79-1754.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 6, 1980.
Decided Dec. 31, 1980.
 
 J. Hamilton Stewart, III, Robert Oliver King, Greenville, S. C. (Ogletree, Deakins, Smoak, Stewart & Edwards, Greenville, S. C., on brief), for petitioners.
 Stephen Burrow, Asst. Gen. Counsel, Washington, D. C. (Arthur M. Goldberg, Gen. Counsel, Washington, D. C., on brief), for petitioners/intervenors.
 Judith Dowd, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, Barbara Kraft, Washington, D. C., on brief), for respondent.
 Before WINTER, Circuit Judge, FIELD, Senior Circuit Judge, and PHILLIPS, Circuit Judge.
 WINTER, Circuit Judge:
 
 
 1
 J. P. Stevens & Company (the company) and the Amalgamated Clothing and Textile Workers Union, AFL-CIO (the union) filed separate petitions for review of an order of the National Labor Relations Board, and the Board cross-petitioned for enforcement.[1] The Board held that the company violated §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3) (1976), at its Rocky Mount, Virginia plant by issuing disciplinary warnings to two employees and by discharging one of them. The Board found violations of § 8(a) (1) of the Act in a speech delivered to assembled employees by a company executive, in two printed notices posted in the plant, and in several statements made by company supervisors to employees. As a remedy, the Board ordered reinstatement and back pay for the discharged employee and required the company to expunge the challenged warnings from employee records. The Board issued a company-wide cease and desist order, required posting and reading of a notice in all company plants, and ordered the company to afford the union access to plant bulletin boards and an opportunity to attend and respond to company speeches on unionization.
 
 
 2
 The company seeks to set aside the Board's order in whole or in part on the grounds that none of the Board's findings is supported by substantial evidence and that the Board abused its discretion in ordering corporate-wide remedies. The union supports the Board's findings and further claims that the discharge of employee Robert Montgomery violated § 8(a)(4) as well as § 8(a)(3). We agree with the union that the discharge of Montgomery violated § 8(a)(4). We hold that substantial evidence does not support the Board's finding that Stevens violated §§ 8(a)(1) and (3) of the Act in issuing two verbal warnings to Montgomery. We set aside the Board's findings and order in this respect. In all other instances, we find that the Board's decision is supported by substantial evidence, and, as modified, we enforce the Board's order.
 
 I.
 
 3
 This case arises from a campaign to unionize the company's textile manufacturing plants in Rocky Mount, Virginia. Richard Cruze was plant manager; Richard Hodges was weaving room superintendent in charge of 832 looms; and T. J. Griffin was group manager of the South Boston, Virginia region. The plant's employees began organizing in support of the union in May, 1976. In mid-August 1976 the union sent a representative to the site and he began formally to organize pro-union employees. Robert Montgomery and Donald Thurmon were members of the union's in-plant organizing committee and among the most outspoken advocates of the union. They signed authorization cards early in the campaign, solicited cards from other employees and distributed union literature.
 
 
 4
 Other facts will be stated later with respect to the specific violation of the Act found by the Board to which they relate. But because the company asserts there is a common factor which pervades all of the Board's findings and undermines its decision, it is appropriate that we address it at the outset of this opinion. The factor is the company's long and substantial history of repeated significant violations of the Act. The company claims it is not only contrary to law but also "reprehensible" for the Board to consider this history as evidence of improper motive in personnel actions or as a factor contributing to the coercive nature of company speeches and notices to employees. We disagree. Certainly a heritage of intransigence could seldom provide the sole basis for a finding of unfair labor practices. See Florida Steel Corp. v. NLRB, 587 F.2d 735, 744 (5th Cir. 1979). However, in carrying out its administrative and enforcement function under the Act, the Board is not required to blind itself to past infractions as is a judge or jury in determining the guilt or innocence of a criminal defendant. That history is relevant to the two types of alleged violations in this case. In considering the § 8(a)(3) charges, the Board's task was to unearth the motive behind company personnel actions in disciplining and discharging employees. Steven's unrivaled willingness to violate the law in the past is just as material to the issue of motive as are the disciplinary records of employees relied upon so heavily by the company to justify the disciplinary action it took. In considering § 8(a)(1) charges, the Board was required to assess the impact of a supervisor's speech on the mind of an employee under the circumstances of a particular case. It is only rational for the Board to conclude that words which represent acceptable argument and opinion in many contexts may take on a more coercive tone in the mind of an employee who considers them against a backdrop of intransigence and retaliation.
 
 
 5
 There is no unfairness in the Board's partial reliance on the company's labor relations history, for it is within the company's power to put an end to that history. Of course the company need not abandon its opposition to unionization and embrace the union. It need only exhibit to the Board, to the courts, and most importantly to its own employees that it is willing to assert its opposition within the limits imposed by the Act. Affirmative steps exhibiting such a willingness or a sustained period of time without serious violations will lead this court to discount Board findings based substantially on company history. Nevertheless, the limits of what is permitted and what is proscribed under the Act are flexible and dependent upon the circumstances of particular cases. As a consequence, the company cannot avoid the shadow of its past by conducting its operations along the outermost fringes of what other employers have been permitted to do in other contexts. If it chooses to take such a course, then it should not be heard to complain when it reaps the harvest of its earlier lawlessness.[2]
 
 II.
 
 6
 § 8(a)(3) Violations.
 
 
 7
 The employer's motive is the focal point in determining whether an employer has discriminated "in regard to hire or tenure of employment or any term or condition of employment" in violation of § 8(a)(3), and the Board's finding as to motive must be upheld if supported by substantial evidence. Perel v. NLRB, 373 F.2d 736, 737 (4th Cir. 1967). The mere presence of legitimate business reasons for disciplining or discharging an employee does not automatically preclude a finding of discrimination. "(I)t is enough that a discriminatory motive was a factor in the employer's decision." Neptune Water Meter Co. v. NLRB, 551 F.2d 568, 569 (4th Cir. 1977). The Board's finding of a § 8(a)(3) violation should be upheld where there is a basis in the record for concluding that discipline would not have occurred, or would have taken a milder form, except for an employee's union activity. Id. at 570.
 
 
 8
 A. Donald Thurmon.
 
 
 9
 The Board found that the company violated § 8(a)(3) in issuing a written warning[3] to employee Donald Thurmon for failure to start up a new warp. This finding is supported by substantial evidence. Supervisor Walter Altice admitted that Thurmon was the best loom "fixer" under his supervision. On September 15, 1976, barely a week after announcing his support for the union in the presence of the plant manager, Thurmon received the first written warning of his fifteen-year career. The administrative law judge credited Thurmon's testimony that the warning came in the midst of an effort by Altice to overburden Thurmon with unnecessary work. Moreover, the evidence shows that Thurmon did attempt to start the warp as requested, but was unable to do so because of missing parts.
 
 
 10
 B. Robert Montgomery.
 
 
 11
 The Board found § 8(a)(3) violations in two verbal warnings issued to employee Robert Montgomery on September 15 and October 20, 1976. We cannot conclude that substantial evidence supports the Board's conclusion. Because the General Counsel did not even address these warnings in his complaint, testimony regarding them is almost nonexistent. At one point, Montgomery testified that he did not recall the October 20 warning. The warnings dealt with intentional acts, the dropping of wires to prevent shutdown of a loom, which Montgomery admitted doing on several occasions.
 
 
 12
 Montgomery received written warnings on September 1 and October 1, 1976, for pressuring other employees to sign union cards. The Board found that the warnings violated § 8(a)(3) not because Montgomery's conduct was protected, but because his punishment was disproportionately harsh when compared to the company's treatment of similar conduct by James Wimmer, a known anti-union employee. The Board's conclusion properly recognizes that "(w)hile the company had the right to enforce reasonable rules to maintain discipline during working hours, it may not distort those rules to club a union which is attempting to organize the employees." NLRB v. Overnite Transportation Co., 308 F.2d 284, 290 (4th Cir. 1962) (citations omitted). Discrimination is apparent when Montgomery's discipline is compared to Wimmer's. On two occasions, Montgomery made harassing but hardly genuinely threatening remarks to fellow employees. On both occasions he received immediate written warnings with no opportunity to speak in his own defense. Wimmer threatened Montgomery twice, once in the presence of a company supervisor, and physically assaulted him. The company initially issued only verbal warnings to Wimmer. Only when Montgomery filed assault charges with the local sheriff after the second incident did the company respond with a written warning to Wimmer. The company argues that the difference in treatment can be explained by supervisor Altice's belief that Wimmer's assault was provoked by Montgomery. However, Altice never offered such an explanation when he testified before the administrative law judge. Thus, the record provides ample support for the Board's finding that the warnings were discriminatory.
 
 
 13
 The Board found a final § 8(a)(3) violation in the discharge of Montgomery by plant manager Cruze on April 1, 1977. The company argues that it never discharged Montgomery, but that he voluntarily quit and that company policy prohibited his rehiring after his job had been posted as vacant. Because of inconsistencies in Cruze's testimony, the administrative law judge credited Montgomery's version of the events of April 1. Montgomery testified that he asked Cruze for a temporary layoff because he was nervous and afraid following Wimmer's assault. Cruze suggested that he visit the doctor. When Montgomery returned after a brief absence, Cruze presented him with hastily prepared termination papers and informed him that he had quit. Despite Montgomery's protests to the contrary Cruze stood firm, even when Montgomery returned to work with tools in hand on the next work day. Cruze's haste in ridding the company of a known union activist less than a week after he had been involved in an altercation with an anti-union employee provides ample basis for the Board's inference of discrimination, especially in light of the company's previous discriminatory treatment of Montgomery. The company's only explanation for the termination, that Montgomery voluntarily quit, is based on discredited testimony.[4]III.
 
 
 14
 § 8(a)(4) Violation.
 
 
 15
 Although the Board found that Montgomery's discharge violated § 8(a)(3) of the Act, it declined to find a violation of § 8(a)(4). That section provides:
 
 
 16
 It shall be an unfair labor practice for an employer ... to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this (Act).
 
 
 17
 29 U.S.C. § 158(a)(4) (1976). We hold that, once the Board discredited the company's explanation that Montgomery voluntarily quit his job, the evidence required a finding that Montgomery's discharge violated § 8(a)(4) as well as § 8(a)(3).
 
 
 18
 Montgomery participated in the investigation of charges filed on September 13, and 27, 1976, which alleged unfair labor practices in issuing disciplinary warnings to Montgomery. In his testimony, supervisor Altice volunteered that he was aware of Montgomery's participation in Board investigations at the time he issued the October 1 written warning. In fact, the record suggests that Montgomery made a regular practice of reporting alleged unfair labor practices to his supervisors and threatening to file charges. Only a week before his discharge, Montgomery told Altice that he intended to file charges if the company continued to countenance his harassment at the hands of Wimmer. On April 1, 1977, the day plant manager Cruze terminated Montgomery's employment, the company received the General Counsel's complaint alleging, inter alia, discrimination against Montgomery.
 
 
 19
 To explain Montgomery's termination, the company claimed that he was not discharged but that he left work voluntarily. The administrative law judge discredited that explanation and found that Montgomery was discharged as a result of union activity. Montgomery's complaints to the Board, threats of further complaints, and participation in Board investigations are inextricably bound to his other union activities. We find no rational basis for believing that the company reacted to one form of activity and not to the other. In keeping with the long judicial tradition of liberally applying § 8(a)(4) to "prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses," NLRB v. Scrivener, 405 U.S. 117, 122, 92 S.Ct. 798, 801, 31 L.Ed.2d 79 (1972), we direct the Board to modify its order to find that Montgomery's discharge violated § 8(a)(4) of the Act.
 
 IV.
 
 20
 § 8(a)(1) Violations.
 
 
 21
 A. Statements by Supervisors.
 
 
 22
 Despite the administrative law judge's finding to the contrary, the Board found a violation of § 8(a)(1) in plant manager Cruze's comments to Montgomery in February 1977. Spotting union cards in Montgomery's pocket, Cruze commented, "Don't you lose them union cards in your pocket." Later that same day Cruze told Montgomery, "I see you haven't lost your union cards."
 
 
 23
 The Board's finding of a violation on these facts is supported by substantial evidence. It is an unfair labor practice for an employer to create in the minds of employees an impression that he is closely observing union organizational activity. Filler Products, Inc. v. NLRB, 376 F.2d 369, 374 (4th Cir. 1967). However innocent the comments may appear to a disinterested observer, Cruze's statements certainly were capable of giving an impression of surveillance to an employee who had previously suffered discrimination as a result of union activity. Directly on point in support of the Board's position is NLRB v. Intertherm, Inc., 596 F.2d 267 (8th Cir. 1979). There the Board, ruling contrary to the administrative law judge, found a § 8(a)(1) violation where a company official simply pulled a union card partially out of an employee's pocket to look at it and made no comment at all. Id. at 273. The Eighth Circuit enforced the Board's ruling.
 
 
 24
 The Board also found a § 8(a)(1) violation in training supervisor McGinnis's statement to employee David Turner in February 1977, asking Turner to let the company know if anyone ever "bothered him about the Union." McGinnis admitted making the statement. An employer's request that an employee report union activity is a clear violation of § 8(a)(1). NLRB v. McCormick Concrete Co., 371 F.2d 149, 151-52 (4th Cir. 1967). Courts have upheld Board findings of violations stemming from almost identical language. Lutheran Hospital of Milwaukee, Inc. v. NLRB, 564 F.2d 208, 211 (7th Cir. 1977) ("Please let me know if you are bothered."), vacated on other grounds, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978); NLRB v. Sunnyland Packing Co., 557 F.2d 1157, 1159-61 (5th Cir. 1977) ("If you should be caused any trouble, or be put under any pressure to support a union, you should report the matter to your Supervisor."). While an employer has the right to shield his employees against unlawful union coercion, he may not issue broad requests to report union activity while making no attempt to distinguish the lawful from the unlawful. See, e. g., Lutheran Hospital of Milwaukee, Inc. v. NLRB, supra. This is particularly true where, as here, the only evidence of any union coercion involved past isolated statements. Montgomery's two statements five months earlier can hardly provide continuing license for the company to commit otherwise unfair labor practices.
 
 
 25
 The Board found another § 8(a)(1) violation in a separate incident involving Turner. In April 1977, superintendent Hodges asked Turner if he had read the company notice regarding union cards. He told Turner that the company "did not need" the union and "did not need" any more union cards. The company argues that the Board improperly found a violation in the simple statement that the employer did not want a union. We need not reach this contention, however, because the statements violate § 8(a)(1) for other reasons. In making the statements, Hodges called Turner's attention to the company's April 5 notice. Since we uphold the Board's finding that the notice itself violated § 8(a)(1), then it is equally unlawful for a company supervisor to urge an employee to read the notice.
 
 
 26
 B. Griffin's Speech.
 
 
 27
 On August 5 and 6, 1976, group manager Griffin read a prepared speech to the entire work force at the Rocky Mount plant. The Board found that, given the "backdrop of continuous unfair labor practices" by the company at other plants for many years, Griffin's speech violated § 8(a)(1) because "(i)ts overriding message to the employees is that selecting a union would be futile and to stay away from the Union or be injured by the (company's) retaliatory measures." Even though there is no factual dispute concerning the actual language of the speech, it is not the role of this Court to determine whether, in some abstract sense, that language violates the Act:
 
 
 28
 (A) reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship.
 
 
 29
 NLRB v. Gissel Packing Co., 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969). We must assess the Board's conclusion in light of all the circumstances surrounding the speech.
 
 
 30
 The prohibition set forth in § 8(a)(1) is limited by § 8(c) which provides:
 
 
 31
 The expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit.
 
 
 32
 29 U.S.C. § 158(c). The Supreme Court has said that § 8(c) "merely implements the First Amendment" and that "an employer's rights cannot outweigh the equal rights of the employees to associate freely." Gissel, supra, at 617, 89 S.Ct. at 1941. The Gissel opinion adds:
 
 
 33
 (A)ny balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.
 
 
 34
 Id.
 
 
 35
 To assist courts of appeals in striking the required balance, Gissel provides particularized guidelines for distinguishing protected from unprotected employer speech:
 
 
 36
 (A)n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union.... He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control.... If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.
 
 
 37
 Id. at 618, 89 S.Ct. at 1942.
 
 
 38
 In several passages Griffin's speech exceeds the limits set forth in Gissel. His predictions of "friction and dissension and often serious trouble" as well as "trouble and tension and strain and strife which often ends up in serious violence" are far from being "carefully phrased on the basis of objective fact." Given the long history of unlawful retaliation by the company, the statements may appear to employees to be outright threats that violence will occur. The company defends the speech, claiming courts have protected similar language "discussing strikes." Neither case cited by the company, however, contains suggestions, unsupported by any objective evidence, that violence may result from union activity. In Boaz Spinning Co. v. NLRB, 439 F.2d 876 (6th Cir. 1971), the employer simply made reference to actual events in other plants where unionization disrupted previously friendly labor relations. In NLRB v. Sanitary Laundry, Inc., 441 F.2d 1368 (10th Cir. 1971), the employer's letters simply discussed the economic hardships faced by striking workers.
 
 
 39
 The major point of contention regarding the speech is Griffin's statement that the identity of union card signatories may be made public in a "court proceeding." The company argues strenuously that almost identical language was held by us in Lundy Packing Co. v. NLRB, 549 F.2d 300 (4th Cir.), cert. denied, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1977), to be not in violation of § 8(a)(1), and that the company cannot be prohibited from informing its employees of the true consequences of signing a union card.
 
 
 40
 There are two answers to the company's claims. First, whatever may be the rule in other areas of the law, truth is not an absolute defense to a charge of unfair labor practices.[5] Otherwise, as the union points out, the company could lawfully direct a company official to tour its plants boasting quite truthfully that the company had fired union advocates in the past. Second, the company's reliance on the similarity between Griffin's language and that in Lundy Packing fails to account for the familiar principle that an employer's speech must be viewed "in the context of its labor relations setting." NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). Here, the speech was given by a high-ranking official in a company whose history of employee coercion was undoubtedly well known among its workers. Under these circumstances, Griffin's concluding remark, "now it is for you to decide whether (publication of union cards) gives you any concern or not," seems a rather pointed hint of retaliation. We decline to disturb the Board's finding that the speech contained implied threats of retaliation and therefore exceeded the bounds of speech protected under § 8(c).[6]
 
 
 41
 C. The October 1 and April 5 Notices.
 
 
 42
 On October 1, the same day that Montgomery received a warning for "intimidating" fellow employee Edward Robertson, the company posted a notice asking employees to report "threats" by union activists. The Board found that the notice violated § 8(a)(1) and we uphold that finding. Courts have enforced Board findings of § 8(a)(1) violations based on almost identical language. See, e. g., Lutheran Hospital of Milwaukee, Inc. v. NLRB, 564 F.2d 208, 211 (7th Cir. 1977), vacated on other grounds, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978); NLRB v. Sunnyland Packing Co., 557 F.2d 1157, 1159-61 (5th Cir. 1977); Bank of St. Louis v. NLRB, 456 F.2d 1234, 1235 (8th Cir. 1972). Moreover, the administrative law judge found and the record indicates that the incident between Robertson and Montgomery was too minor to present any real need for such a notice.
 
 
 43
 On April 5 the company posted a notice captioned in large red print "SIGNING AN ACTWU UNION CARD CAN HAVE SERIOUS CONSEQUENCES." The notice contained an oversized replica of a union card and went on to explain that by signing a card employees may give up the right to a secret ballot election and the right to bargain as individuals.
 
 
 44
 The company points to a number of cases in this Circuit and elsewhere, one involving Stevens itself, where courts of appeals have refused enforcement of Board orders condemning notices containing language that unionization may lead to "serious harm."[7] E. g., NLRB v. Holly Farms Poultry Industries, 470 F.2d 983 (4th Cir. 1972); J. P. Stevens & Co. v. NLRB, 406 F.2d 1017 (4th Cir. 1968). What the company neglects to say is that other cases enforce Board orders dealing with the same "serious harm" language. E. g., J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 302-03 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). Moreover, none of the cases cited by the company hold that the "serious harm" language is per se protected under § 8(c). Every opinion reiterates the familiar principle that an employer's speech must be viewed "in the context of its labor relations setting." E. g., NLRB v. Aerovox Corp., 435 F.2d 1208, 1211 (4th Cir. 1970) (quoting NLRB v. Gissell Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969)). The coercive effect of an employer's speech in a particular labor relations setting, "is a question essentially for the specialized experience of the NLRB". Daniel Construction Co. v. NLRB, 341 F.2d 805, 811 (4th Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965).
 
 
 45
 Against the background of Stevens' history of misconduct, the Board could reasonably conclude that the poster was unlawfully coercive. Moreover, the notice was posted only a day after Montgomery, a known union activist, disappeared from the plant. Employees certainly had reason to pause and consider the "serious consequences" resulting from union activity at that particular moment.[8]
 
 V.
 
 46
 Lastly we turn to the remedies prescribed by the Board. In general, the Board has broad discretion in its choice of remedies and courts of appeals should not disturb the Board's judgment unless it clearly fails to effectuate the policies of the Act. NLRB v. Seven-up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953). We find no basis for concluding that the Board exceeded the limits of its discretion in this case.
 
 
 47
 The company claims Montgomery forfeited his right to reinstatement and back pay because of his "reprehensible" conduct in pressuring Preston, Robertson, and Jenkins. NLRB v. Apico Inns, 512 F.2d 1171 (9th Cir. 1975), cited by the company, affirms the principle that:
 
 
 48
 (T)he misconduct which will justify a court in refusing to enforce a Board order to rehire depends upon the degree and kind of the misconduct and each case must be decided on an ad hoc basis.
 
 
 49
 Id. at 1175. In Apico, the employee denied reinstatement had forced another employee to quit due to his sexual advances, had been drunk on the job, had made profane and derogatory remarks about management in the presence of customers, and had solicited a fellow employee to engage in prostitution. 512 F.2d at 1173. The comparison of this type of conduct to Montgomery's two efforts at pressuring fellow employees adequately refutes the company's contention.
 
 
 50
 The company also contends that Montgomery is not entitled to reinstatement and back pay because he lied before the administrative law judge. The administrative law judge is in a better position than the court to assess the overall credibility of a witness and to call for sanctions for deliberate misconduct. Here, the administrative law judge did not find Montgomery's dissembling sufficiently egregious to deny him an otherwise proper remedy, and we will not disturb his conclusion.
 
 
 51
 The company challenges the "extraordinary" corporate-wide remedies imposed by the Board. In its substance the remedy is identical to that enforced by this court in J. P. Stevens & Co. v. NLRB, 612 F.2d 881 (4th Cir. 1980), cert. denied, 446 U.S. 916, 100 S.Ct. 1848, 64 L.Ed.2d 270 (October 21, 1980), enforcing 240 NLRB No. 35 (1979). The company's extraordinary history of lawlessness calls for approval of the remedy in this case. The violations found here are probably more extensive than the interrogations and coercive statements found unlawful in the case in which we enforced the identical order.
 
 
 52
 Finally, the company complains that the Board wrongly failed to consider as a mitigating factor its "voluntary" actions aimed at insuring compliance with the Act. We see no basis for this contention. The company's present "voluntary" action is no guaranty of future compliance. A court-enforced order provides substantially greater protection to employees.
 
 
 53
 We direct the Board to modify its order in accordance with the opinion and grant enforcement of the order as modified.
 
 
 54
 MODIFIED AND ENFORCED.
 
 
 55
 FIELD, Senior Circuit Judge, dissenting in part:
 
 
 56
 While I am in agreement with much of the majority opinion, I cannot concur with respect to certain of the section 8(a)(1) charges, specifically, Griffin's speech covered by section IV B of the opinion and the April 5th notice which warned that signing a Union card could have "serious consequences" and which is covered in Section IV C of the opinion. Bluntly stated, it occurs to me that in ordering enforcement on these two charges, the majority has changed the established law of this circuit, something which I had always supposed should be effected only by an en banc court.
 
 
 57
 In holding Griffin's speech violative of section 8(a)(1), the majority finds that the company's reliance upon Lundy Packing Company v. N.L.R.B., 549 F.2d 300 (4 Cir. 1977), cert. denied, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1977), is misplaced. Conceding that Griffin's language was almost identical to that in Lundy, the majority, nevertheless, finds our decision in that case inapposite since Griffin's speech was "given by a high-ranking official in a company whose history of employee coercion was undoubtedly well known among its workers." What the majority neglects to note, however, is that this was the very issue addressed by us in Lundy. In Lundy the majority of the Board, in finding the employer's speech violative of section 8(a)(1), stated:
 
 
 58
 In so concluding, we are persuaded that any doubt about the reasonably inhibitory effect of Lundy's remarks on employees is removed when these remarks are viewed in the context of Respondent's hostility to unionization and its other unlawful conduct herein.
 
 
 59
 Respondent's union hostility is unmistakable. President Lundy's yearly practice has been to warn the employees in his close-of-the-year speeches that Respondent would not tolerate a union in the plant. Lundy repeated this theme in his May 8 speech. Lundy clearly meant what he said and, as the evidence here indicates, Respondent was quite willing to resort to unlawful measures to counter the employees' organizational efforts. Thus, Respondent maintained in force a rule which unlawfully prohibited employees from distributing union literature on company property; it interrogated employees about the union activities of other employees; it created the impression that the union activities of its employees were under surveillance; and it unlawfully discharged prominent union adherents.
 
 
 60
 It is in this context that Lundy's speech to the assembled employees on May 8 must be evaluated. * * * In short, we believe that any doubts about the unlawful implication of Lundy's remark that "we are not going to have (a union)" were removed by Respondent's unlawful conduct which speaks louder than its words.
 
 
 61
 223 NLRB 139 (March 19, 1976). Upon review, we summarily rejected the Board's rationale, stating that "(i)n our opinion such speech constituted protected speech and may not be found to be a violation of the Act." 549 F.2d at 301.
 
 
 62
 Similarly, with respect to the April 5th notice which carried the caption "SIGNING AN ACTWU UNION CARD CAN HAVE SERIOUS CONSEQUENCES", the majority turns its back upon a long line of authority in this circuit. See, e. g., L. S. Ayres & Co. v. N.L.R.B., 551 F.2d 586 (4th Cir. 1977); J. P. Stevens & Co. v. N.L.R.B., 406 F.2d 1017 (4th Cir. 1968); N.L.R.B. v. Greensboro Hosiery Mills, Inc., 398 F.2d 414 (4th Cir. 1968). Disregarding our own decisions on the subject, the opinion cites the Second Circuit's decision in J. P. Stevens & Co. v. N.L.R.B., 380 F.2d 292 (2nd Cir. 1967), to support its conclusion that "(a)gainst the background of Stevens' history of misconduct, the Board could reasonably conclude that the poster was unlawfully coercive." I can neither understand nor accept the majority's reliance upon that case since the Second Circuit candidly acknowledged in its opinion that it was in disagreement with our decisions on the issue. Id., at 302. Any doubt about our position should have been put to rest by our decision in J. P. Stevens & Co. v. N.L.R.B., supra, 406 F.2d 1017. In that case we had before us the identical notice which had been held to be coercive by the Second Circuit, and Judge Butzner, writing for the court, stated:
 
 
 63
 This notice has been widely used by employers in organizational campaigns, and courts differ on its validity. We have held on several occasions that similar statements do not violate § 8(a)(1) and we adhere to our previous rulings. (Footnote omitted). Id., at 1021.
 
 
 64
 Judge Butzner specifically referred to Stevens' "history of unfair labor practices" yet, despite that fact, the majority of the panel saw no reason to depart from the established law of this circuit. In the light of our opinions in Stevens, 406 F.2d 1017 and Lundy, I find it impossible to reconcile the majority position with our decisions in this area.[1]
 
 
 65
 I am constrained to make one final comment. In Judge Boreman's separate opinion in Stevens v. N. L. R. B., supra, 406 F.2d 1017, 1024, he made the following observation:
 
 
 66
 Similar notices and statements have been held by this court on several occasions to be nonviolative of section 8(a)(1) as noted by Judge Butzner. There is conflict among the circuits on this question but, notwithstanding this court's repeated statements of its position, the Board has steadfastly refused to recognize and respect the decisions of this court. Instead, in cases recurring in this circuit where this question arises the Board persists in finding such a company declaration of attitude as violative of the Act. I agree with Judge Butzner's summarization that "We adhere to our previous rulings."
 
 
 67
 An examination of the opinion of the Administrative Law Judge and the decision of the Board in the present case indicates that the Board's intransigence has continued throughout the twelve years since Judge Boreman made this statement. In finding the 8(a)(1) violations, the Administrative Law Judge cited the Board's decisions in Lundy Packing Co., J. P. Stevens, and L. S. Ayers, despite the fact that he was well aware that in each of those cases we had declined enforcement of the Board's order on those charges. It is apparent that the Board has elected to follow its own precedents on these issues rather than abide by our decisions. "Congress has not given to the NLRB the power or the authority to disagree, respectfully or otherwise, with decisions of this court."[2] Speaking for myself, I have no patience with such administrative arrogance and am more than disquieted by the action of my brothers in unwittingly placing their imprimatur upon the Board's conduct.
 
 
 
 [1]
 245 NLRB No. 20 (1979)
 
 
 [2]
 "(A)n employer, who has control over (the employer-employee) relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior. He can easily make his views known without engaging in 'brinksmanship' when it becomes all too easy to 'overstep and tumble (over) the brink.' " NLRB v. Gissel Packing Co., 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969)
 
 
 [3]
 Under company policy, a written warning represents a form of discipline less severe than discharge and more severe than a verbal warning
 
 
 [4]
 The company's brief spends a good deal of effort in suggesting that Montgomery was attempting to manipulate the Virginia unemployment compensation system in order to leave work and receive benefits. If this was in fact Montgomery's intent, then it simply supports his contention that he asked to leave work only if a temporary layoff could be arranged. He did not want a voluntary termination which would leave him ineligible for unemployment compensation. See Va.Code § 60.1-58(a)
 
 
 [5]
 While Griffin's statements may be literally true, they nevertheless present a distorted view of the union organizing process. Obtaining a card majority is only one means by which a union may become a bargaining representative. Moreover, the public "court proceeding" which Griffin described (actually a hearing before the Board) would occur only where the General Counsel had found probable cause to complain to the Board that independent unfair labor practices committed by Stevens precluded a valid election. See NLRB v. Gissel Packing Co., 395 U.S. 575, 613-615, 89 S.Ct. 1918, 1939-1941, 23 L.Ed.2d 547 (1969). Thus, Griffin's statement is true only to the extent that he foresees the company's possible future illegal behavior
 
 
 [6]
 Our dissenting brother argues that, not only is the language of the employer's speech in Lundy Packing almost identical to that of Griffin's address, but the "labor relations setting" of the earlier case is indistinguishable as well. We deem the two cases very different. The speeches themselves differ significantly. Griffin's words carried implications that violence could result from union activity. His assertion that union card signatories would be identified in public was amplified by his suggestion that "it is for you to decide whether this gives you any concern or not." Aside from a remark about union cards, the only potentially objectionable statement in Lundy's speech was the simple assertion, "we do not want a union in this company, and we are not going to have one." 223 NLRB at 134. The circumstances surrounding the two speeches differ even more markedly. Aside from the maintenance of an arguably unlawful no-solicitation rule, see 223 NLRB at 139 & 140 n.4, there is no suggestion in Lundy Packing that, prior to the employer's speech, employees were aware of any unfair labor practices committed by the company. As Board Chairman Murphy pointed out in his dissent, the other unlawful acts committed by Lundy took place after his speech to employees. 223 NLRB at 140. The company's employees, much to the contrary, were subjected to an address by the representative of an employer with two decades of history exhibiting an unrivaled willingness to violate the law
 
 
 [7]
 We need not linger long on the company's assertion, citing a dictionary, that the language "serious consequences" differs significantly from the "serious harm" language of earlier cases. We cannot fault the Board for assuming that textile workers, unlike lawyers, generally do not go to work with thesaurus in hand
 
 
 [8]
 While our dissenting brother suggests that our holding here discards established authority, we do not perceive that, when we deal with a factual issue in the field of labor law as to whether a writing or a speech was coercive, aside from general principles, there are any authorities which are truly stare decisis. We reiterate what was said in NLRB v. Aerovox Corp., 435 F.2d 1208 (4th Cir. 1970):
 In prior decisions we have held that the typical "serious harm" notice was protected by the First Amendment and the "free speech" provisions of Section 8(c). In these decisions we have concluded that a "serious harm" statement does not, alone, amount to a "threat of reprisal or force or promise to benefit." We adhere to that proposition.
 We also agree, however, that all statements and notices must be viewed in the setting in which they are made. We did not say otherwise in J. P. Stevens & Co. v. NLRB, 406 F.2d 1017 (4th Cir. 1968) .... (emphasis added)
 Id. at 1210-11 (citations omitted). In the 1968 Stevens case, a divided panel of this court held that a similar "serious harm" notice did not violate § 8(a)(1). In that case which this court denominated "Stevens III," 406 F.2d at 1021, to indicate that it was the third Stevens unfair labor practice case to reach the courts the court dealt with a notice posted during the first years of the union organizational campaign and before even the first judicial decision upholding Board findings of unfair labor practices committed by Stevens. See J. P. Stevens & Co. v. NLRB, 380 F.2d 292 (2 Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). Twelve years later, as we address a similar notice in this the twenty-second case in which the company has been found guilty of unfair labor practices, we conclude that history has provided decisive weight on the side of the rights of employees in the delicate balance between the employer's right to speak and the employee's right to associate freely.
 
 
 [1]
 In footnote 8 the majority apparently derives some comfort from our opinion in N. L. R. B. v. Aerovox Corp., 435 F.2d 1208, 4th Cir. In that case, however, the Board had found a Section 8(a)(1) violation based upon a coercive and inflammatory letter as well as a "serious harm" notice. We enforced the Board's order solely upon the basis of the coercive letter, stating:
 Since the letter was unquestionably coercive and is by itself sufficient to support the Board's Order, the Board's present insistence that we reconsider the possible implication of J. P. Stevens & Co. v. N. L. R. B., 406 F.2d 1017 (4th Cir. 1968), appears to be rather academic. There is no occasion for us to reconsider our prior decision in Stevens because the result here will be the same whether that decision should be reaffirmed, rejected, or distinguished. (Footnote omitted)
 Although we believe the "serious harm" notice in the context of this case is protected by the First Amendment and Section 8(c) of the Act, for the reasons hereinbefore stated, the Order of the Board will nevertheless be Enforced.
 435 F.2d at 1212.
 To me, the bottom line of the majority opinion is clear Stevens must forfeit its rights under the First Amendment and Section 8(c) of the Act as punishment for its twelve years of Union opposition. In my opinion, such an attainder has no place in our national labor law. I find myself in complete accord with the observations of the Fifth Circuit in Florida Steel Corp. v. N. L. R. B., 587 F.2d 735, 753 (1979):
 Since there was nothing in the record on which the ALJ and the Board could base their decision that the distribution of the letter was a violation of § 8(a)(1) of the Act, we can only conclude that the Company's long history of opposing the Union, standing alone, was the sole basis for their decision.
 Viewed in this light, it becomes clear that the Board entered its order (that the distribution of the letter by the Company was a violation of § 8(a)(1) of the Act) for the purpose of punishing the Company because of its opposition to the Union in this and other cases. This is not permissible, and we cannot approve it. The proper role of the Board is akin to that of an impartial and neutral referee. Its orders are required to be remedial, not punitive. Many cases have so held. It is fundamental that the Board has no authority to punish a company because it is against a union. Any company has a perfect right to be opposed to a union, and such opposition is not an unfair labor practice.
 
 
 [2]
 Judge Aldisert in Allegheny General Hospital v. NLRB, 608 F.2d 965, 970 (3 Cir. 1979)