943 F.2d 49
 138 L.R.R.M. (BNA) 2160
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BERETTA U.S.A. CORPORATION, Respondent.
 No. 90-3152.
 United States Court of Appeals, Fourth Circuit.
 Argued April 9, 1991.
Decided Aug. 26, 1991.
 
 On Application for Enforcement of an Order of the National Labor Relations Board.
 Margaret G. Bezou, National Labor Relations Board, Washington, D.C. (Argued), for petitioner; Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Judith A. Dowd, Supervisory Attorney, Nancy B. Hunt, National Labor Relations Board, Washington, D.C., on brief.
 Larry M. Wolf, Whiteford, Taylor & Preston, Baltimore, Md. (Argued), for respondent; Peter D. Guattery, Whiteford, Taylor & Preston, Baltimore, Md., on brief.
 NLRB
 ORDER ENFORCED.
 Before NIEMEYER, Circuit Judge, JOHN C. GODBOLD, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation, and RICHARD L. WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 JOHN C. GODBOLD, Senior Circuit Judge:
 
 
 1
 This matter is before us on an application by the Board to enforce its order, 298 NLRB No. 27, finding that Beretta U.S.A. Corp. committed violations of §§ 8(a)(1) and (3) of the National Labor Relations Act. We enforce the Board's order.
 
 
 2
 At its facility in Maryland Beretta imports and distributes firearms and manufactures pistols. Approximately 400 persons were employed when this matter arose.
 
 
 3
 The Board found that Beretta violated § 8(a)(1), 29 U.S.C. § 158(a)(1), by interrogating an employee about union activities and by creating an impression among its employees that union activities were under surveillance. It also found that the company violated §§ 8(a)(1) and (3) by adverse actions against employee Ronald Pelletier, consisting of reprimands, discipline, withholding overtime work, giving an unfavorable performance appraisal, withholding a wage increase, and discharge, all taken because of his union organizational efforts.
 
 
 4
 Union organizing activities by the UAW commenced in October or November 1987, and by January 1988 there were rumors in the plant about an organizing campaign.[1]
 
 
 5
 On January 7, shortly before quitting time, Pelletier placed on employees' cars in the parking lot fliers announcing a union meeting to be held that night. Pelletier's supervisor was Linwood Green, supervisor of the tool and die department. Nagy, the toolroom and engineering department superintendent, was Green's supervisor. He told Green about Pelletier's distributing the fliers.
 
 
 6
 On Christmas eve of 1987 Green had accused Pelletier of having a bad attitude and told him to look for another job. Earlier in 1987 Pelletier had been ordered to keep out of the metrology lab of the plant because of employee complaints about him. Pelletier admitted that he had disregarded the order.
 
 
 7
 There was evidence from witness White that on a date not precisely fixed but estimated to be "a little before January" or "around that time" he overheard Green say that Pelletier had been complaining about his wages, was a troublemaker who disliked the way the place was run and wanted to take over Green's job, and that Pelletier was instrumental in organizing for the UAW and thus would cause trouble in the toolroom. Green denied making the union activity statement, but the Board credited the testimony of White.
 
 
 8
 On January 13 the UAW filed a petition with the Board seeking recognition on behalf of production and maintenance employees. The next day it delivered to the company a letter demanding recognition based on alleged card majority.
 
 
 9
 On January 15 the company posted on bulletin boards and distributed to all employees an anti-union notice, signed by the general manager/executive vice-president. It stated that the company had received a letter from the union demanding recognition based upon a card majority. It denied the union's claim of employee support and said that the company did not "believe a union is necessary." It characterized the UAW as "a notorious strike-happy union [that] is especially unwelcome." The notice promised a forthcoming exposition by the company of why the UAW would not be in the best interest of employees, their families, or of Beretta.
 
 I. The § 8(a)(1) violations
 
 10
 The Board found that there was no evidence of a massive anti-union campaign of coercive conduct. But it found coercive actions had been taken by Donald Dean, the quality control manager of the plant. There was testimony that in January, later than the foregoing events, Dean had called a meeting of some of the employees assigned to his department. He showed them a copy of the notice the company had sent out, and he stated that he did not want anyone in quality control joining the union. He told the employees that if anyone signed a union card it would get back to the Labor Relations Board, which would give the employee's name to the personnel office, so that the company would know about it. Dean denied the details of this meeting, but the Board did not credit his testimony. This evidence adequately supported a conclusion that the statements were made by Dean, a management representative speaking to rank-and-file employees, and would have a tendency to restrain or coerce the employees in the exercise of their § 7 right to sign union cards. See J.P. Stevens & Co., Inc. v. NLRB, 638 F.2d 676, 683 (4th Cir.1980) (supervisor's comment indicating that he had observed union cards in an employee's pocket gave an impression of surveillance); NLRB v. Tamper, Inc., 522 F.2d 781, 785 (4th Cir.1975) (employer created an impression of surveillance by a remark from a supervisor personally opposed to unionization that he knew how many people were attending union meetings); S.E. Nichols, Inc., 284 NLRB 556, 577 (1987) (supervisor's statement that his lawyer could receive union cards violated § 8(a)(1)).
 
 
 11
 The Board did not err in finding that Dean's remarks were made in the context of contemporaneous unfair labor practice. The record does not show previous unfair practices, but unfair practices followed thereafter, including interrogation of Riviera in March about union card-signing.
 
 
 12
 The Board's finding of coercive interrogation is supported by personnel director Cole's questioning, in March 1988, in Cole's office, of employee Riviera concerning whether Riviera had been "pestered" by the union with a union card. Cole denied making the inquiry about the union card, but the Board did not err in crediting Riviera's testimony rather than Cole's.
 
 
 13
 There was no error in the Board's amending the charges to add the § 8(a)(1) violations. The evidence supports conclusions that they were related to discriminatory discipline and discharge of Pelletier and that these matters grew out of company efforts to keep the union out of its plant.
 
 II. Discipline and Discharge of Pelletier
 
 14
 The §§ 8(a)(1) and (3) violations found by the Board arising from Beretta's actions toward Pelletier require examination of a series of events extending over several months.
 
 
 15
 Pelletier was employed by Beretta in March 1987. It is not disputed that he and Green, who became supervisor of the tool and die department in September 1987, had a history of poor personal relationships dating back to before UAW activity began.
 
 
 16
 Union activity was going on in January 1988. The company had knowledge of Pelletier's activities, and the Board found that Green had been apprised of Pelletier's union activities shortly after January 7.
 
 
 17
 On January 15 Pelletier had a shouting confrontation with personnel director Cole concerning a deduction from his pay for a leave taken by Pelletier on a "snow day" and not supported by medical records as required by company policy. Cole reported this to general manager Bonaventure, and Pelletier was given a 30-day suspension. The Board found that his conduct in the confrontation was insulting, demeaning, and insubordinate and that the penalty was not shown to be disparately excessive. The correctness of these findings is not questioned.
 
 
 18
 On January 19 Pelletier attended a "counseling session" with four supervisors. Cole told him that he was suspended for 30 days and gave him a written reprimand which stated that he was disciplined for his conduct in the confrontation with Cole. It also said:
 
 
 19
 further incidents of insubordination, or any action contrary to work rules or regulations will be grounds for additional disciplinary action, up to and including termination.
 
 
 20
 In late January the union filed a charge with the NLRB contending that the suspension of Pelletier was discriminatory. This was withdrawn in early February.
 
 
 21
 After the suspension Green told a supervisor in the lab that he was "glad that Mr. Pelletier was gone because he was a pain in the ass because he kept putting the department in jeopardy talking about the union." Green denied referring to the union, but the Board accepted the testimony of the witness who described the conversation. From this the Board concluded that Green's animosity toward Pelletier was increased because he perceived Pelletier's activities as jeopardizing the toolroom.
 
 
 22
 When Pelletier returned from suspension on the morning of February 18, he had a conversation with a new employee, telling him that the machine to which he was assigned did not perform properly and that the last employee to use it was unjustly fired. In another conversation he said that use of the bathroom was improperly restricted. There was other testimony that, on the same morning, several employees complained to Green about Pelletier, and that Green reported to his supervisor that Pelletier was "going to drive me crazy;" that the supervisor then told Green to keep Pelletier away from everybody else to avoid harassment, and Green assigned Pelletier tasks in a location where he could not "contaminate" new employees.
 
 
 23
 Pelletier testified that he was called to Green's office the same morning and told to stop harassing people and "bad mouthing" the company lest he be fired, and that he had responded that he merely wanted the new employee to be careful because the last operator of the machine was fired, and in any event his remarks were made when he was on his own time. The events of the morning were reported to Nagy. He made a note in Pelletier's personnel file that Pelletier had been told:
 
 
 24
 Harassment of employees is disrupting productivity and morale and unless he stopped at once I was going to fire him.
 
 
 25
 The Board, after a long and detailed examination of the testimony of numerous witnesses concerning the February 18 occurrences, found the testimony of company witnesses to be inconsistent, contradictory, and not mutually corroborative and, therefore, it accepted Pelletier's version of the events.[2]
 
 
 26
 Supervisor Nagy testified that on February 18 or later he instructed that Pelletier was not to be given the desirable assignment of overtime work and gave as his reason Pelletier's attitude and his harassment of other employees on February 18. According to Green, the instruction to deny overtime came at a later date and for the reason that Pelletier was engaged in a slow-down of production.
 
 
 27
 On March 11 Pelletier was given a formal written appraisal of his work, which said that he wasted time; he was the subject of employee complaints; he was insubordinate, uncooperative, and his attitude hindered production; and his production was low.[3] Pelletier was informed by Nagy that he would not receive a raise at that time because his production was low and he had a bad attitude. Pelletier responded that previously he had been told his work was fine (though he stated that Green had advised him to seek another job because of his bad attitude), and that he had never been told that his output was low, and that his timecharts would show he was working as fast as he could. For a series of reasons the Board rejected the company's version that after Pelletier's suspension his production was low, he engaged in time-wasting and slow-down, and his attitude was poor. With respect to low production the Board found that the company largely relied on subjective evaluation by Green. Green acknowledged that he had been ordered, in the post-suspension period, to document any production failures by Pelletier. But Beretta had made no effort to objectively document Pelletier's alleged work deficiency, and no effort to effectively compare his post-suspension and pre-suspension work though data was available. Also Green had either deliberately destroyed or failed to preserve timesheets relating to Pelletier's work that the Board found would have been probative. The Board rejected the testimony of company witnesses concerning low production and accepted the testimony of Pelletier that the quantity and quality of his post-suspension work remained high.
 
 
 28
 Beretta introduced testimony that after his suspension Pelletier displayed a poor attitude, engaged in time-wasting and slow-down. The Board rejected this testimony by company witnesses as generalized, vague, uncertain, inconsistent, and not mutually corroborative.
 
 
 29
 Pelletier was fired on April 1 in a meeting with Green, Nagy, and in-house counsel. He was told that he was being terminated because the amount of work he produced was not commensurate with the amount of money he was being paid. Pelletier responded that he was producing more than he ever had. Nagy disagreed. A notice later sent to Pelletier gave as the reason for discharge:
 
 
 30
 low productivity, poor attitude ... his poor attitude results in less than adequate production output.
 
 
 31
 The Board, summarizing the evidence relating to post-suspension events, found the company's evidence was not credible because it was vague, general, shifting, inconsistent, in part not mutually corroborative and in part contradictory, and given by witnesses who were hesitant, uncertain, and evasive. It found Pelletier's testimony, though self-serving, had not been effectively rebutted and therefore was credible. We cannot say that the Board's credibility findings as to the separate post-suspension events and as to post-suspension events in gross were erroneous.
 
 
 32
 In analyzing the evidence the Board noted that prior to his union activity Pelletier had never been formally reprimanded for poor work performance or productivity nor disciplined, and any "miscreant behavior" had been tolerated. Then it found:
 
 
 33
 When Green became aware of Pelletier's union activities, it reinforced his animosity toward Pelletier by compounding Respondent's perception of him as a troublemaker. Green thereafter visualized Pelletier's union activities as jeopardizing his department. Green's union animus is in accord with the animus demonstrated by Dean and the anxiety revealed by Cole in his interrogation of Riviera. It is also in accord with that of Bonaventure who in his letter cited the UAW as "notoriously strike happy," "especially unwelcome," and one which he implied [sic] risked the security of the employees, the employees' families and Respondent's own enterprise.
 
 
 34
 With credibility findings made, the Board concluded that after returning from suspension Pelletier had been subjected to unwarranted and contrived discipline and reprimands and finally discharged and that these adverse actions, made with knowledge of Pelletier's union activities, were demonstrably false and unfounded. Based on the evidence with credibility findings made, these conclusions were not unjustified. Substantial evidence on the record as a whole supports the Board's findings.
 
 
 35
 The Board then turned to Wright Line, 251 NLRB 1083 (1980), enf'd 622 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982). It found the evidence that we have described sufficient to support the inference that protected conduct was a motivating factor in the company's decision to discipline, reprimand, and discharge Pelletier. It further found that Beretta had failed to meet its burden of demonstrating with credible, probative evidence that Pelletier would have been disciplined, reprimanded and discharged in the absence of union activity. Therefore it found violations of §§ 8(a)(1) and (3). These conclusions were justified on the record as a whole.
 
 
 36
 Beretta questions the findings regarding Pelletier on numerous grounds.
 
 
 37
 (a) Friction between Pelletier and Green, bad attitude by Pelletier, reprimand of Pelletier by Green, all contributing to a desire by Green to fire Pelletier before there was any union activity: The Board did not overlook these factors. Rather it accepted them and found that Pelletier's union activities significantly contributed to Green's existent personal animus and resentment toward Pelletier. The Board found:
 
 
 38
 [it] is clear that Green's hostility toward Pelletier as a perceived troublemaker preceded the latter's union activity but was also reinforced by awareness of that protected activity. Union activity thus aggravated a poor relationship between the two men.
 
 
 39
 Also, see finding quoted above that "When Green became aware of Pelletier's union activities, it reinforced his animosity toward Pelletier by compounding Respondent's perception of him as a troublemaker." With respect to the conversation described by witness White, the Board found:
 
 
 40
 Green's comments to Peterka reveal that Pelletier's union activities significantly contributed to Green's pre-existing animosity to and resentment of Pelletier's perceived objectionable behavior and troublemaking arising from personality antagonisms with Green and with other employees and Pelletier's own personal complaints of underpayment for his superior skills vis a vis other workers.
 
 
 41
 It found that after the suspension and before Pelletier's discharge his union activity was added to the past conduct that Green found objectionable.
 
 
 42
 Substantial evidence supports the Board's findings concerning the exacerbation of Green's animus by Pelletier's union activities.
 
 
 43
 (b) The January 15 confrontation leading to the suspension and the ensuing reprimand and warning: The Board found Pelletier's conduct on January 15 was insulting and demeaning to the supervisor and the suspension not inappropriate. Beretta does not contend that these events could, by themselves, justify subsequent adverse actions--it had already punished him for this conduct. Rather Beretta asserts that the January 15 incident and the resulting suspension and warning, taken together with post-suspension factors, justified the actions it later took. This takes us to (c), the post-suspension factors referred to by Beretta--bad and deteriorating attitude, decreased productivity, insubordination, harassment of other employees, a poor performance evaluation on March 1. These post-suspension matters were found by the Board to be not proved. Moreover, with respect to the final action directed to Pelletier--his discharge--the only reason given orally to him for his discharge was low productivity, and the only written reason was that his poor attitude was causing low productivity. The January 15 confrontation and the resulting suspension, alleged harassment of other employees, and insubordination were not referred to as reasons.
 
 
 44
 ENFORCED.
 
 
 45
 NIEMEYER, Circuit Judge, and RICHARD L. WILLIAMS, District Judge, joined.
 
 
 
 [1]
 In the spring of 1987 there had been an unsuccessful attempt to organize by the International Association of Machinists. That union withdrew from its efforts
 
 
 [2]
 Apparently Pelletier did not deny making the remark about the bathroom
 
 
 [3]
 Beretta acknowledges that Pelletier is a highly skilled worker